583 A.2d 434

**Peggy L. GRUBER, Appellant,**

v.

**Kenneth E. GRUBER, Jr., Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 4, 1990.

Filed Dec. 3, 1990.

176

Michael A. Goldber, Lancaster, for appellant.

George E. Christianson, Lebanon, for appellee.

Before OLSZEWSKI, BECK and HOFFMAN, JJ.

BECK, Judge:

The issue in this case is the standard to be applied by a trial court in determining under what circumstances a parent who has primary physical custody may relocate outside the jurisdiction of the court.

Appellant, Peggy Gruber (mother), appeals from the trial court's order denying her permission to move out of the state with her children and conditioning her continued retention of primary physical and legal custody of her children on her remaining in Pennsylvania. For the reasons which follow, we affirm in part, reverse in part and remand for proceedings consistent with this opinion.

Appellant Mother and appellee Kenneth Gruber, Jr. (father) were married in 1980. They have three children: Jason, age 4; Stephanie, age 2; and an infant born after this appeal was filed.[1] The parties separated in November, 1989. On November 15, 1989, the court issued an order that gave legal and primary physical custody to mother and gave father visitation on alternate weekends and numerous, specified holidays. This order reflected a custody agreement between the parties.

After the parties separated, mother and children continued to live in the house which she rented from father's parents. Pursuant to an order entered together with the above-mentioned custody order, father was paying mother $475.00 a month in child support and $150.00 a month in spousal support. Father visited the children approximately as often as the visitation schedule allowed.

During one of his visits with the children on New Year's eve, 1989, father argued with mother and allegedly shoved and hit her in the shoulder. The parties' small children witnessed the conflict. Mother was pregnant at the time. A few days later, as a result of the recent clash and also because of continued threats to her safety, mother petitioned the court for a protection from abuse order. The

---

**1.** Appellant was several months pregnant at the time of the hearing in the trial court and when her appeal to this court was taken. The birth of the third child was confirmed at oral argument.

parties agreed by stipulation that father would refrain from any manner of abuse in the future. However, the stipulation did not restrict father's visitation with the children except to the extent that it imposed a notice requirement and also prescribed that the visits would take place in father's parents' nearby apartment. Mother became increasingly depressed and isolated in her surroundings. Her deteriorating psychological state was the result of many factors including the confrontations with her husband, a perceived animosity from her in-laws, a lack of emotional support in the absence of friends or family, and anxiety about having to move from her apartment which no longer was going to be available to her through her in-laws. As a result appellant decided that the best alternative for herself and the children would be to relocate to an area where she would have family and support nearby and where she could conclude her pregnancy and begin caring for her children in a more stress-free and promising environment. Appellant's brother and sister-in-law in Illinois invited her and the children to live with them in their home and, in addition, offered to support them until she became self-sufficient.

Father learned of mother's intentions to leave Pennsylvania. On January 30, 1990 he petitioned the trial court for issuance of a writ ne exeat seeking to prevent mother from removing the children from the state.[2] Two weeks later, mother petitioned the trial court for modification of the visitation order "so as to accommodate [mother's] permanent return to Illinois with her two minor children".

A hearing was held on the two petitions on February 26, 1990 before the Honorable G. Thomas Gates. At the hearing both mother and father testified regarding the potential impact of the move. Mother explained that her brother had offered her and the children a home, support and help with future employment. She testified that her brother was her

2. Originally, father believed that mother intended to relocate to Texas because that is where mother's father resides. Although mother apparently viewed a move to Texas to be with her father as an initial option, ultimately she decided that her brother's offer to provide a home for her in Illinois was the better alternative.

closest relative and that other relatives were at even greater geographical distances. She emphasized that she had no friends in the area and felt exceedingly isolated. Her understanding was that she had to vacate her current living arrangements in the near future and was unable to afford alternate housing.[3] Although she acknowledged that appellee had offered to permit her to stay in their former marital residence, she hesitated because it was in an unfinished condition, was very expensive to maintain and was, once again, extremely isolated. Mother also testified that she recently had been treated for depression and she offered the testimony of Dr. Terry Tressler, her obstetrician. Dr. Tressler noted that appellant was under considerable stress as a result of her current family situation and stated that he thought the anxiety would have an unquantifiable yet real negative impact on her pregnancy. He opined that a move into a positive, supportive environment would lessen her tension and be beneficial to her health.

Father testified that he had been employed for over three years at the flight facility at Indiantown Gap as a helicopter mechanic and was entitled to thirty days off a year. He also is a member of the Pennsylvania National Guard which requires him to be on duty two weeks every summer. He stated that after he learned of mother's intention to leave the state with the children he concluded that, rather than have her relocate, he wanted custody of the children. Barring that, father stated a preference for splitting custody arrangements so that he would have the children during the school year and mother would have partial custody during the summer months. He stated further, in response to questioning, that should he have the children in the summertime, his parents would be able to care for them while he fulfilled his military obligations with the National Guard.

In an effort to convince the trial court to alter the formerly agreed upon custody arrangements, father testi-

---

**3.** We note that her current arrangements were costing mother $550.00 a month for room and board and that this amount apparently came out of a total of $625.00 in income she received monthly from spousal and child support.

fied that mother had, in his opinion, attempted to isolate the children from his parents and other family members and that her housekeeping and caregiving capabilities were inadequate. On his behalf, father called his sister and brother, both of whom testified that mother had tended to keep the children from fully participating in family events and from playing with their cousins. Father's sister also stated that mother's housekeeping was below par. In response, mother stated that her home had gotten markedly tidier since father had moved out. She further stated that she tended to avoid her brother-in-law's children as playmates for her own children because they had dissimilar child rearing approaches and she felt that the contact did not benefit her children. We note that Dr. Tressler described the children as seemingly happy, well-adjusted and well-behaved.

Following the hearing, the trial court issued an order which again awarded legal and primary custody of the children to their mother and visitation rights for the father.[4] However, the trial court ordered further that "the children shall not be removed from the jurisdiction of this Court. Should the mother move from the Commonwealth of Pennsylvania, the children shall remain in legal and primary custody of the father during the school year and with the mother during the summer vacation months of June, July and August."

Mother appealed to this court and challenges the trial court's refusal to modify the custody arrangements so as to allow her to move to Illinois and retain primary custody of the children. The trial court justified its conclusion by explaining that "the best interest[s] of the children are paramount to either parties' desires". The trial court apparently found that the children's interests could be served only by remaining in "an environment where they have access to both parents". The trial court noted that "[moth-

---

4. Father does not challenge this aspect of the trial court's order. As long as mother remains in Pennsylvania, father appears to agree with the trial court that mother is the best, suitable primary custodian for the children.

er] can start her life over in another state, but the children's lives will not be disrupted in the process". We find that the trial court erred in so ruling and we reverse that aspect of the trial court's order.

In the instant "relocation" case, this court once again is faced with resolving a conflict with deep and almost irreconcilable competing interests at stake. Our task is to formulate a solution which recognizes and attempts to serve the crucial interests involved without creating excessive hardship. Until now, our court has articulated a standard for resolving "relocation" conflicts which states simply that the best interests of the child governs the result. *See, e.g., Clapper v. Clapper*, 396 Pa.Super. 49, 578 A.2d 17 (1990); *Lozinak v. Lozinak*, 390 Pa.Super. 597, 569 A.2d 353 (1990). While we do not dispute that achieving "the best interests of the child" remains the ultimate objective in resolving all child custody and related matters, we believe that the standard must be given more specific and instructive content to address, in particular, "relocation" disputes. Unless more direction is provided, the trial court is left without adequate guidance and of necessity may decide these cases on impressionistic and intuitive grounds. Such an approach does not do justice to the critical concerns at stake in "relocation" cases nor does it provide for uniform, evenhanded, and predictable dispute resolution.

At the outset we note that our research has failed to reveal a consistent, universally accepted approach to the question of when a custodial parent may relocate out-of-state over the objection of the non-custodial parent. In fact, the opposite is true. Across the country, applicable standards remain distressingly disparate. Despite the disparity, however, a few guiding principles emerge from several well-reasoned cases which we have carefully examined in fashioning a standard by which our courts can resolve relocation disputes.[5]

5. *See D'Onofrio v. D'Onofrio*, 144 N.J.Super. 200, 365 A.2d 27 (Ch. Div.), *aff'd*, 144 N.J.Super. 352, 365 A.2d 716 (App.Div.1976); *Hale v. Hale*, 12 Mass.App.Ct. 812, 429 N.E.2d 340 (1981); *Auge v. Auge*, 334

In what we view as an insightful and helpful caveat regarding the context within which relocation cases must be assessed, the court in *Helentjaris v. Sudano,* 194 N.J.Super. 220, 230, 476 A.2d 828, 833 (1984), observed:

> [I]t is obvious that for the child the fact of the divorce becomes the predicate of his subsequent relationship with both parents and that relationship can never be the same as it would have been had the marriage remained intact. Adjustments and accommodations must be made as a result of the divorce, the whole point of which was to permit each parent to go his or her own way. Within reason, both parties must be permitted to do so, and the child's best interests must be served within that context.

Consequently, the *Helentjaris* court cautioned against a futile "judicial insistence on maintaining a wholly unrealistic simulation of unity". *Id.* at 229, 476 A.2d at 832.

After divorce, out of the single family two new family units are created; the one in which the parent has primary physical custody of the children and the other in which the parent has partial custody of the children.[6] In terms of the best interests of the child the primary physical custody family must be viewed as the family central and most important to the child's best interests.

It is in that family that the day-to-day routine and the day-to-day emotional interaction between parent and child are established. These myriad and ordinary contacts forge the child's character, psychological health, and value system. While the family of the non-custodial parent is important to the child, the nature of that relationship is necessarily different and less intense and not as formative and influential as the other.

N.W.2d 393 (Minn.1983); *Cooper v. Cooper,* 99 N.J. 42, 491 A.2d 606 (1984); *Holder v. Polanski,* 111 N.J. 344, 544 A.2d 852 (1988); *In re Marriage of Zamarripa–Gesundheit,* 175 Ill.App.3d 184, 124 Ill.Dec. 799, 529 N.E.2d 780 (1988); *DeCamp v. Hein,* 541 So.2d 708 (Fla.App. 4 Dist.1989).

**6.** We do not address the situation in which the parents share physical custody of the child and each has an equal amount of time with the child. However, where appropriate the standards set forth as to relocation as advanced in this opinion should apply.

In determining the best interests of the child we must, therefore, focus on the primary custodial family. "[W]hat is advantageous to the unit as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interests of the children." *D'Onofrio*, 144 N.J.Super. at —— ——, 365 A.2d at 29–30. *See also DeCamp v. Hein, supra; Simon v. Simon*, 435 So.2d 941, 942 (Fla.Dist.Ct.App.1983).

Therefore, our analysis begins with the recognition that divorce causes irrevocable changes in parent-child relationships. Further, we emphasize that the best interests of the child are more closely allied with the interests and quality of life of the custodial parent and cannot, therefore, be determined without reference to those interests.[7] In the context of relocation cases this principle translates into an understanding that when relocation is likely to result in a substantially enhanced quality of life for a custodial parent, often the child's best interests will be indirectly but genuinely served.

■ On the other hand, this court is fully appreciative of and sensitive to the mutual interest of the child and the non-custodial parent in maintaining as healthy and loving a relationship as possible. Indeed, we have characterized this interest emphatically as follows: "Every parent has the right to develop a good relationship with the child, and every child has the right to develop a good relationship with both parents." *Pamela J.K. v. Roger D.J.*, 277 Pa.Super. 579, 593, 419 A.2d 1301, 1309 (1980). The task of this court is to sacrifice the non-custodial parent's interest as little as

---

7. As the court observed in *Cooper v. Cooper*, 99 N.J. 42, 53–55, 491 A.2d 606, 612 (1984):

"The realities of the situation after divorce compel the realization that the child's quality of life and style of life are provided by the custodial parent. That the interests of the child are closely interwoven with those of the custodial parent is consistent with psychological studies of children of divorced or separated parents.... [C]hildren of all ages 'were in trouble' when the home parent-child relationship was affected by stress on the home-parent, such as 'loneliness and discouragement'."
(citations omitted).

184

possible in the face of the competing and often compelling interest of a custodial parent who seeks a better life in another geographical location.

Thus, in every relocation dispute the following interests must be accommodated as nearly as possible: the custodial parent's desire to exercise autonomy over basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children. Keeping these interests in mind,[8] we have developed a standard to accommodate those often conflicting interests. We do so with a knowledge that there can be no black letter formula that easily resolves each case and with the profound appreciation that no resolution can eliminate all disruptions for both parents and children affected by relocation after divorce.

In order to decide whether a custodial parent and children shall be permitted to relocate at a geographical distance from a non-custodial parent, a trial court must consider the following factors. First, the court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent. In considering the prospective advantages to the move, a court shall not limit itself solely to enhanced economic opportunities for the custodial parent but must also assess other possible benefits of the relocation. For instance, relocation may be motivated by a desire to return to a network of family or friends, or to pursue educational opportunities, or to seek an improved physical environment in which to live and raise children. Clearly, these examples are not intended to be exhaustive nor will

8. *See* cases cited in footnote 5.

each be applicable in every case. We emphasize, however, that courts are not free to ignore or discount non-economic factors which are likely to contribute to the well-being and general happiness of the custodial parent and the children. Ordinarily, when the move will significantly improve the general quality of life for the custodial parent, indirect benefits flow to the children with whom they reside.

Next, the court must establish the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it. The court must assure itself that the move is not motivated simply by a desire to frustrate the visitation rights of the non-custodial parent or to impede the development of a healthy, loving relationship between the child and the non-custodial parent.[9] An aspect of this determination is the degree to which the court can be confident that the custodial spouse will comply cooperatively with alternate visitation arrangements which the move may necessitate. Likewise, the court must consider the motives of the non-custodial parent in resisting relocation and decide whether the resistance is inspired by motives other than a legitimate desire to continue and deepen the parent-child relationship.

Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent. We recognize that, in many cases, former weekly visitation may have to give way to an altered schedule which allows for less frequent but more extended contact between parent and child. However, the necessity of shifting visitation arrangements to account for geographical distances will not defeat a move which has been shown to offer real advantages to the custodial parent

9. However, we caution courts not to equate a former spouse's desire to escape from unpleasant confrontations with the non-custodial parent or from the turmoil which may result from a failed marriage with a desire to defeat visitation rights. Although a custodial parent legitimately may wish to leave what he or she considers a hostile environment for a more supportive one, that parent may remain committed to maintaining a strong relationship between the children and the non-custodial parent.

and the children. We agree with the court in *D'Onofrio,* which stressed:

> The court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the [custodial parent] and children be forfeited solely to maintain weekly visitation by the [non-custodial parent] where reasonable alternative visitation is available and where the advantages of the move are substantial.

*D'Onofrio,* 144 N.J.Super. at ——, 365 A.2d at 30. *See also DeCamp v. Hein,* 541 So.2d 708, 712 (Fla.App. 4 Dist.1989); *Auge v. Auge,* 334 N.W.2d 393, 398 (Minn.1983) (relocation should not be disallowed solely to maintain the existing visitation patterns).

When a custodial parent seeks to relocate at a geographical distance and the non-custodial parent challenges the move, the custodial parent has the initial burden of showing that the move is likely to significantly improve the quality of life for that parent and the children. In addition, each parent has the burden of establishing the integrity of his or her motives in either desiring to move or seeking to prevent it. The custodial parent must convince the court that the move is not sought for whimsical or vindictive reasons. Likewise, the non-custodial parent must show that resistance to the move stems from concern for the children and his or her relationship to them. The court must then consider the third factor discussed above, namely the feasibility of creating substitute visitation arrangements to ensure a continuing, meaningful relationship between the children and the non-custodial parent. Once again, we reiterate that a move sought to secure substantial advantage for the custodial parent and children will not be disallowed simply because visitation cannot continue in the existing pattern. Sensitive case-by-case balancing is required to ensure that all interests are treated as equitably as possible.

Having enunciated the standard, we turn to the facts of the instant case and conclude that mother should be

permitted to relocate to Illinois with her children and infant. In our view, the trial court impermissibly either ignored or underestimated the pertinent factors which mother produced to establish that the move would substantially enhance the quality of her life and that of her children. As a result the trial court abused its discretion in denying her permission to move with the children. The record showed that mother considered herself to be living in an alien environment, surrounded by people she knew solely through her now-estranged husband. She had no close friends in the area and no family. Whatever support she may have received from her in-laws prior to the dissolution of the marriage apparently no longer existed for her after the marriage failed. Mother experienced considerable feelings of loneliness and anxiety due to her isolation from friends and family in what was obviously a time of crisis. Her living arrangements were about to expire, leaving her with no desirable alternatives. She was unemployed and had little hope of becoming immediately self-supporting given the responsibilities of a new baby and two small children. Her relationship with appellee was marred by frequent confrontations, at least some of which occurred in front of the children. Appellant's doctor verified that she was being treated for depression and that the stress she was experiencing was likely to have a negative effect on her health.

In contrast to her situation in Pennsylvania, the contemplated move to Illinois offers the mother the opportunity to approach the future and raise the children surrounded and supported by family and friends. Her brother and his wife have offered to have her and the children live with them in their home. They have promised financial support for the present and aid in securing employment in the future. The move apparently would place her closer to where she grew up and would allow her to re-establish a network of friends from her past, with whom she has kept in touch. Finally, the move would allow her to escape the turmoil and troubled confrontations with her estranged husband.

In light of the foregoing, we conclude the mother more than met her burden of establishing that the proposed move would significantly and directly improve the quality of life for herself and therefore her children. We stress that we consider the children's well-being and best interests inextricably joined to the health and happiness of the custodial parent. We think it is indisputable, under the circumstances of this case, that appellant's ability to be an effective parent to her children is seriously undermined by the difficulty and unhappiness of her life in Pennsylvania.[10] Conversely, there is no question that the move to Illinois is likely substantially to promote the well-being of the mother and, consequently make her a more effective, superior parent. We think it is fundamental that the best interests of the children cannot, in this case, be severed from the interests of the mother with whom they live and upon whose mental well-being they primarily depend.[11]

With respect to the integrity of the motives of the parties in seeking and resisting the move, the record reveals no evidence whatsoever that either party is acting with illegitimate purposes. Appellant's desire to move clearly is motivated by the need for security, support and solace from family and friends. She is not seeking to deny father access to the children nor did she evidence any recalcitrance in allowing father to exercise his visitation rights.[12] In fact, both mother and father stated that she permitted father

**10.** See footnote 7, *supra.*

**11.** *See In re Marriage of Burgham,* 86 Ill.App.3d 341, 345–46, 41 Ill.Dec. 691, 408 N.E.2d 37, 40 (1980), in which the court noted: "[G]ranting [relocation] would likely benefit the child by making the custodian a happier, better adjusted parent than would be the case if the custodian's freedom of movement was more restrained."

**12.** Mother admitted that she was somewhat nervous about father's reaction should the trial court permit the move, because she testified that father had repeatedly threatened to "take the kids and run away with them" if she left Pennsylvania. Father denies ever making such an across-the-board threat and insists he made the statement only out of a fear that mother might disappear with the children without informing him of her whereabouts. In any event, mother testified specifically that she had no intention of keeping the children and their father apart and that her desire to move was prompted only by a need to "start my own life over again".

access to the children as often as the visitation order permitted.

Finally, there does not appear to be any overly burdensome impediment to a revised, realistic visitation schedule which adequately could foster a continuing relationship between father and the children. Father testified to an annual leave time of thirty days from his job. He further testified that his parents could help him with child care in the event he had partial custody of the children during times when he had to work. Father appears to have an extensive and seemingly close family nearby to help him during times when he might assume the role of primary caregiver. No doubt father would prefer to retain the status quo and achieve easier, more frequent access to his children. However, weighing this factor, as we must, against the demonstrated substantial advantages of the proposed move for mother and children, we cannot say that the shifting of the accustomed visitation arrangements warrants depriving mother and the children of the benefits of the move.

Plainly, the resolution of relocation cases such as the instant one involves imperfect and often painful solutions. We realize that modified visitation arrangements frequently will not appease a parent who feels that he or she is losing the children when the other parent decides to leave the area. However, we believe that the realities of life for a divorced, custodial parent and for the children residing in that home compel the balance we have struck today. We seek simply to allow the custodial parent, upon whom the principal burden and responsibility of child rearing falls, the liberty and autonomy to make decisions for the future of his or her family. On the other hand, this freedom cannot be exercised so as to impose too burdensome an expense on the relationship between the children and the other parent. It is hoped that the test we announce today will allow for rational and equitable solutions to this difficult problem.

In conclusion, our disposition is as follows. We affirm the trial court's award of primary legal and physical custo-

dy to the mother. We reverse the trial court insofar as it denied mother permission to relocate to Illinois and still retain primary custody of the children. Further, we remand to the trial court with instructions to enter an order granting appellant permission to move with the children to Illinois. In addition, we instruct the trial court to conduct whatever proceedings it deems necessary to determine a revised visitation schedule under the new circumstances which will maximize contact between the children and their father.

Order affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.