## Klingman v. Klingman

C.P. of Lehigh County, no. 1998-FC-1182.

*John P. Karoly,* for plaintiff.
*Linda Shay Gardner,* for defendant.

BLACK, *J.,* August 16, 2001—This matter is before the court on the petition of plaintiff Jean C. Kling-

man-Madeira (Mother) for permission to relocate to Fayetteville, North Carolina, with her 7-year-old son, Joshua Klingman. The child's father, defendant Paul E. Klingman Jr. (Father), objects to the proposed relocation. He has filed a cross-petition to modify the existing custody order so that he will have primary physical custody of Joshua in the event that Mother moves to North Carolina.

A hearing was held on July 24-25, 2001, at which the parties, their current spouses, various family members and friends, and two psychologists testified. On August 3, 2001, I interviewed the child in the presence of counsel for the parties and the guardian ad litem.

Based on the evidence presented, I find that the best interests of the child require that the petition to relocate be denied. Mother has indicated that if her petition to relocate were denied, she would not move to North Carolina. Therefore, Father's cross-petition for primary physical custody is moot.

## FINDINGS OF FACT

(1) The parties were married in December of 1980.

(2) The parties are the natural parents of a minor child, Joshua Klingman, who was born on November 20, 1993.

(3) The parties are also the natural parents of an adult child, Paul Klingman III, age 20, currently a college student at Carnegie Mellon University in Pittsburgh, Pennsylvania. Paul spends his school vacations with Father.

(4) The parties had a third child, Adam, who passed away at age 4 in 1994, when Joshua was just over a year old.

(5) Following Adam's death, the parties drifted apart, leading eventually to Father's departure from the marital residence in February or March of 1998 and the entry of a divorce decree on September 1, 1999. Although the parties lived under the same roof until 1998, they did not live together as a couple from 1996 on.

(6) On July 29, 1999, the parties entered into an agreement that was incorporated, but not merged into the divorce decree. The agreement provided, inter alia, for shared legal custody of Joshua; for Mother to have primary physical custody; and for Father to have partial physical custody three weekends a month from Friday through Sunday and also one evening during the week so long as it was coordinated with Mother's work schedule.

(7) Since the parties' separation and even after their July 29, 1999, written agreement, they communicated regularly with each other regarding the custody arrangements and worked out a flexible schedule that changed from month to month to best accommodate their child's needs and their work schedules. When the opportunity arose for Mother to take Joshua with her on a monthlong trip to Africa in January 2000, Father agreed even though it meant giving up his custodial rights that month.

(8) As a result of the parties' flexible custody arrangements prior to the relocation petition, Joshua spent 98 overnights with Father from June to December 1998; 176 overnights with Father in 1999; and 168 overnights with Father in the year 2000.

(9) This high level of cooperation, for which both parties are to be commended, ended with the filing of

Mother's petition for relocation. Since then, at Father's insistence, they have adhered strictly to the terms of the July 29, 1999 written agreement.

(10) Mother married Robert Madeira in April of 2000. Dr. Madeira is a medical doctor who recently completed his internship in internal medicine at Lehigh Valley Hospital.

(11) Father married Mary Klingman on September 30, 2000. Mrs. Klingman operates her own business, a cleaning service.

(12) Mother resides with Dr. Madeira at the parties' former marital residence, 5574 Ohls Lane, Coopersburg, Lehigh County, Pennsylvania. The property is a single-family home and has been Joshua's primary residence since his birth. It is located in the Southern Lehigh School District.

(13) Father has resided with his wife at 5017 Lanark Road, Center Valley, Lehigh County, Pennsylvania, since April of 2000. The property is also a single-family home located in the Southern Lehigh School District. Joshua has his own separate bedroom for those occasions when he stays overnight with Father.

(14) Mother is a registered nurse and has been employed at Lehigh Valley Hospital in this capacity for the past 18 years. At the time of the parties' separation she worked a full weekend shift at the hospital.

(15) In the fall of 1999, Mother reduced her employment to 24 hours a week over two days, so that she could have more time at home with Joshua and also so that she could return to school to complete her studies for a

bachelor's degree. Mother's academic status currently is that of a college junior.

(16) Father is self-employed, being the owner and operator of Klingman's Custom Floors Inc., a retail floor covering business that he started in 1990. His usual work hours are Monday through Friday from 8:30 a.m. to 4:30 or 5 p.m. Occasionally he also does some work on a Saturday. Father has two employees in his business, which gives him some flexibility to spend time with Joshua during the week, if circumstances require.

(17) Joshua is currently scheduled to begin the second grade at Liberty Bell Elementary School in the Southern Lehigh School District. Joshua has adjusted well to school, both academically and socially. He is an intelligent and personable 7-year-old with many interests, ranging from computers to animals.

(18) Joshua has a close attachment to both of his parents. Because of their commendable cooperation, he has been able to enjoy an outstanding relationship with both of them.

(19) Joshua also enjoys a close relationship with his maternal grandmother and his paternal grandparents, all of whom reside in the Lehigh Valley area. He visits with them weekly. He also visits regularly and enjoys a good relationship with his stepmother's parents, who live in a nearby community.

(20) Joshua's extended family also includes a great-grandmother and great-aunt on Father's side, living in Emmaus, as well as various aunts, uncles and cousins on both sides of his family, living in the Lehigh Valley and elsewhere in Pennsylvania and New Jersey.

(21) Joshua has developed an unusually strong bond with his stepfather, Dr. Madeira, and with his stepmother, Mary Klingman.

(22) With Mother and stepfather, Joshua participates in "family time" every evening after dinner. This usually includes some physical activity outdoors and some quiet play such as a board game. It is followed by Bible-reading before Joshua goes to bed. Mother and stepfather have taken Joshua on vacation trips to Tennessee, to Cape Cod, and last January, to Kenya, Africa, for an entire month.

(23) With Father and stepmother, Joshua enjoys spending time caring for their pets, which include his dog "Shadow" and various animals raised by his stepmother. He also enjoys going fishing with Father.

(24) Mother and Dr. Madeira desire to relocate with Joshua to Fayetteville, North Carolina. The purpose of the relocation would be to enable Dr. Madeira to accept a very desirable job offer from a hospital in that area.

(25) Dr. Madeira initially tried, through various "head-hunters," to obtain a suitable position in his field of internal medicine, closer to the Lehigh Valley. However, although other positions were available, he found nothing as desirable as the offer he has received from the North Carolina hospital.

(26) Mother has no family or friends in North Carolina. However, some of her family members and friends have indicated that they would make periodic visits to that area.

(27) The North Carolina position would pay Dr. Madeira $150,000 per year with six weeks of vacation and

no "on-call" responsibilities. This would be a substantial improvement over his current circumstances. Pending his anticipated move to North Carolina, he has been working for local physicians on a temporary basis earning at the rate of approximately $100,000 per year.

(28) If Dr. Madeira is able to accept the North Carolina position, Mother would not have to work. She would then have more time to spend with Joshua and could also go back to school to complete her college education.

(29) If the petition to relocate is refused, Mother and Dr. Madeira intend to remain in the Lehigh Valley so that she can maintain primary custody of Joshua. Dr. Madeira would then begin a new job search, and Mother would continue with her part-time employment at Lehigh Valley Hospital.

(30) In his previous job search, Dr. Madeira indicated to recruiters that he was interested in a job only if it was located in Pennsylvania, Maryland, the northern part of Virginia, and the southern part of New York (excluding New York City). He also limited himself, at first, to metropolitan areas with a population of not less than 25,000 nor more than 250,000, but later changed his objective to areas of not less than 50,000 nor more than 500,000. He eliminated the entire State of New Jersey from consideration because, according to him, the northern part of this state is too much like New York City, while the southern part of the state consists mainly of towns that are too small.

(31) Dr. Madeira also excluded from consideration the Lehigh Valley job market because positions in internal medicine here would offer only $90,000 to $100,000 per

year plus a production bonus depending on receipts generated. Also, Dr. Madeira felt that doctors in the Lehigh Valley carried patient loads more onerous than he wanted to encumber himself with.

(32) Dr. Madeira received a job offer from a private medical practice in Altoona, Pennsylvania, that would have started him at $100,000 per year for a 40-hour work week, with an opportunity to buy into the practice in the future. He rejected this offer because he felt he would end up working more than 40 hours per week and because the job required that he be on call every fourth night and every fourth weekend. Altoona is approximately three and one-half hours from the Lehigh Valley by automobile.

(33) Dr. Madeira could have had additional job offers from health care providers in other locations much closer to the Lehigh Valley than North Carolina, but he did not follow up on these potential opportunities because he felt they did not meet his requirements. In some cases, the potential offers were from small practices that would have required him to be on call every third night and every second or third weekend. In other cases, the opportunities were in towns of 20,000 to 50,000 people, which he felt were too small. In still other cases, the potential offers did not include sufficient vacation time to meet his desires. For example, Dr. Madeira believes he would have received an offer in Warren, Pennsylvania, except that he insisted on six weeks off per year rather than the proposed four weeks per year.

(34) Dr. Madeira's current employment is only temporary, but there is no evidence that he cannot find ad-

equate employment within the Lehigh Valley or within a reasonable driving distance from the Lehigh Valley, if he changes the parameters of his search to include positions with on-call responsibilities, positions with less than six weeks of vacation per year, positions in the State of New Jersey, and/or positions in communities with fewer than 50,000 people.

(35) Mother's desire to move to North Carolina is not the result of a momentary whim. She believes that the quality of her life will be substantially improved and that, as a result, the quality of Joshua's life will also be improved. However, she will be moving away from a network of family and friends, with whom she and Joshua will be able to have only limited contact.

(36) There is no evidence that the Fayetteville, North Carolina area has superior educational, cultural or social advantages for Joshua over what is available in or near the Lehigh Valley.

(37) The motives of Mother in seeking to relocate as well as the motives of Father in opposing the relocation are sincere and honorable.

(38) Mother has proposed, with the support of her expert witness, that Father be given partial custody for two periods of 15 days each during the summer, for most of the winter and spring school breaks, and for one extended weekend each month during the school year. An extended weekend would be a three-day weekend when Joshua had the following Monday or the preceding Friday off from school.

(39) Mother has offered to pay the cost of transporting Joshua by airplane between Fayetteville, North Caro-

lina and the Lehigh Valley airport for Father's periods of custody. She also proposed purchasing web cameras for Father and herself so that Father and Joshua could communicate over the Internet by videoconference.

(40) Although Mother's proposal would provide Father with substantial custodial time and is offered in good faith, it is far less than the regular, weekly custody that Father presently has. It would significantly limit the ongoing relationship between Joshua and Father.

(41) The proposal to fly Joshua to the Lehigh Valley each month for extended weekend visits is not realistic. For Joshua to fly back and forth over a three-day period would leave little time for a meaningful visit. Much of the weekend would be taken up by traveling to and from the airport, checking in prior to the flight, and waiting at the airport for the plane to depart. There is also the element of uncertainty inherent in air travel. Flight delays because of weather conditions or equipment problems are not uncommon. In addition, flight schedules can be quite limited and are subject to change.

(42) Since there are only a limited number of extended weekends, there is no opportunity for flexibility in scheduling the visits. Therefore, as Joshua grows older, weekend trips to the Lehigh Valley will likely create tensions for him because of potential conflicts with his social and recreational activities.

(43) An alternative plan would be to give Father custody for all but one or two weeks in the summer, plus the entire Thanksgiving, winter and spring school breaks. This would be more workable, but such a schedule would still adversely affect the ongoing relationship between

Joshua and Father because of the long stretches of time in which they would have no direct face-to-face contact.

(44) Joshua's close relationship with his Father will be substantially impaired if he relocates to North Carolina.

(45) It is in Joshua's best interests that he either remain in the Lehigh Valley or locate in an area within several hours from the Lehigh Valley by automobile.

(46) If Dr. Madeira relaxes some of his job search requirements, he will be able to find satisfactory employment in his chosen field of internal medicine within that area.

## DISCUSSION

The "ultimate guidepost" in a child custody case, including a relocation dispute, is the child's best interests. *Meyer-Liedtke v. Liedtke,* 762 A.2d 1111, 1115 (Pa. Super. 2000). Our focus in this case, therefore, must be on what is best for Joshua rather than on doing justice between the parties. *English v. English,* 322 Pa. Super. 234, 240, 469 A.2d 270, 273 (1983). In analyzing a case such as this, one can easily become distracted by considerations of fairness to the parents. That is not, however, what the law requires or permits. We must keep our eye on the ball: what is in the best interests of the child?

Unfortunately, there is no simple way to make this determination. It must be done on a case-by-case basis, based upon a "consideration of all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being." *McAlister v. McAlister,* 747 A.2d 390, 391 (Pa. Super. 2000).

Although the child's best interest remains the ultimate guidepost, the Superior Court has adopted a three-pronged test to assist in resolving custody relocation disputes. In *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990), the court held that the following three factors should be given special consideration in a custody relocation case:

"(1) the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent; . . .

"(2) the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; and . . .

"(3) the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent." *Id.* at 184-85, 583 A.2d at 439.

In applying the *Gruber* test, a court must seek to accommodate the following interests as nearly as possible:

"[T]he custodial parent's desire to exercise autonomy over basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children." *Id.* at 184, 583 A.2d at 438-39.

Mother contends that the proposed relocation meets all three of the *Gruber* factors, and, therefore, that her petition to relocate should be granted. However, after careful consideration of the evidence presented, I reach a different conclusion. There is no doubt that Mother's motives are sincere and honorable. She has been an admirable parent, and I am sure she wants only the best for her son. Thus, the second *Gruber* factor is clearly met. I am not satisfied, however, that the proposed relocation will substantially improve Joshua's quality of life, or that realistic, substitute arrangements can be made to adequately foster Joshua's ongoing relationship with Father. On balance, I believe that Joshua's interests are best served if he does not relocate to North Carolina.

Regarding the first *Gruber* factor, it is clear that the proposed move would provide substantial economic advantages to Mother and Dr. Madeira. The high salary offered to Dr. Madeira in North Carolina will enable Mother to cease work, to spend more time with her son, and eventually to go back to school to complete her college education. Nevertheless, quality of life is not to be evaluated simply in economic terms. A relocation decision cannot be based simply on where the custodial parent or her spouse can obtain the highest income. Quality of life is a much broader concept. It must take into account the fact that if the relocation takes place, Mother and Joshua will be exchanging their strong network of family and friends in the Lehigh Valley for a collection of unknown and uncertain relationships. Quality of life also requires a consideration of educational, cultural and social advantages; and in this case Mother has not proven

any such advantage to Joshua from the proposed relocation.

In short, we cannot simply consider the extra salary and vacation time that Dr. Madeira would have in North Carolina and the attendant benefits that would pass through to Joshua. In comparing the quality of life that Joshua would have in North Carolina with his quality of life in the Lehigh Valley, we have to consider the loss of his strong network of family and friends in this area and the disruption in his life by a move to a distant community. As a general rule, where a child's existing relationships are satisfying and meaningful, it is far better to preserve those relationships than to take a chance on the unknown. According to Dr. Jane Tyler Ward, a psychotherapist who testifed as an expert witness for Father,

"[W]hen one parent relocates and the child no longer has access to both parents, the result can be traumatic, especially to a sensitive child like Josh. There is a significant body of literature that details the negative effects of removing children from a familiar cultural and social context. In this case, Josh would be away from a nuclear and extended family with whom he has significant bonds."[1]

Thus, a move to North Carolina may well be advantageous from Dr. Madeira's perspective and even from Mother's perspective because of the additional family income and additional vacation time. However, from Joshua's perspective, his quality of life is likely to be adversely affected by the disruption of the move, the loss of his network of extended family and friends, and most

---

1. Defendant's exhibit 5, p. 4.

important, the loss of the substantial, regular contact that he now has with Father.

Furthermore, in applying the first prong of the *Gruber* test, the court must compare the economic benefits of the proposed relocation not only with the present employment of Mother and her spouse, but also with other potential opportunities. In this case, Dr. Madeira recently completed his internship in internal medicine and has been searching for a new job in that field. He has found what he believes to be his dream job at a hospital in North Carolina. However, the proper comparison is not between this "dream job" and his current temporary position. We must also consider the other opportunities reasonably available to Dr. Madeira in the Lehigh Valley and in areas much closer to the Lehigh Valley than North Carolina.

Unfortunately, neither party presented testimony from a vocational expert or similar witness regarding the employment prospects of an internal medicine specialist of Dr. Madeira's caliber. It appears, however, from Dr. Madeira's own testimony that he did have another substantial job offer from a private practice in Altoona, Pennsylvania; that he could have obtained other offers had he not insisted on six weeks of vacation each year and no on-call responsibilities; and that he excluded from consideration any positions in the State of New Jersey or in communities with a population of less than 50,000 or more than 500,000. Thus, the record does not support the argument of Mother's counsel that Dr. Madeira will be without a job if he is unable to take the North Carolina position. There is no evidence that Dr. Madeira is unable to obtain a position that most people, even spe-

cialists in internal medicine, would consider quite suitable. He may have to relax some of the parameters he has set, such as his total exclusion of the State of New Jersey. But this is not too much to ask of him. His understandable desire for autonomy in decisions that directly affect his life must be tempered by the need for Joshua to maintain a meaningful relationship with his father.

The third *Gruber* factor presents an even more serious problem. Because of the distance between North Carolina and the Lehigh Valley, there is no realistic, substitute arrangement for visitation that can adequately foster the kind of ongoing relationship that Father and Joshua have enjoyed. Joshua's substantial, regular contact with Father cannot possibly be sustained if he moves such a distance away.

Mother has suggested monthly visits by Joshua to Father, these trips to take place over three-day weekends. However, because of the distance and travel time involved, this is simply not practical. Mother testified that it is a relatively short trip by airplane from Fayetteville to the Lehigh Valley Airport. However, the airtime is but a small part of the trip. Joshua must be taken to the airport substantially in advance of the departure time. We do not know how far he must travel to get to the airport. No information has been provided as to the flight schedules. There is no assurance that there are or will be any flights leaving on Friday after Joshua leaves out from school. Thus, he may have to fly up on Saturday, spend Saturday night and Sunday with Father, and then fly back to North Carolina on Monday. This is not an adequate substitute for the substantial contact that Joshua now has with Father.

Moreover, it is common knowledge that airplanes are often late in taking off; that sometimes flights are cancelled because of weather or equipment problems; and that even flights that take off are sometimes re-routed to other destinations. Relying on such transportation is not a desirable arrangement for a 7-year-old boy.

In addition, as Joshua grows older, he will become more involved with his peer group. There will be social events, athletic programs, and other activities. It is foreseeable that tension will develop between his desire to travel to the Lehigh Valley to visit his Father and his desire to participate with his peers in normal weekend activities in North Carolina. These tensions are avoided or at least minimized if Joshua is permitted to grow up in or close to the same community in which father resides.

In summary, applying the *Gruber* factors, I am not convinced that Joshua's quality of life will be substantially improved as a result of the proposed relocation, and I do not see any realistic, substitute arrangements that would continue the close relationship that Joshua has enjoyed with Father. Furthermore, our analysis cannot stop with consideration of the three *Gruber* prongs. The ultimate guidepost remains Joshua's best interest. Considering his strong attachment to both of his parents and to his extended family in the Lehigh Valley area, and considering the many activities that he participates in with both parents, I can only conclude that it is in Joshua's best interests to deny the proposed relocation. Joshua is a well-adjusted, happy boy, who is thriving in his present environment. We should try to keep him so.

Dr. Marla Isaacs, a psychologist with excellent credentials, testified as an expert witness for Mother after having interviewed Joshua, Mother and Dr. Madeira. Her purpose, as explained in her report, was "to assess if Joshua would suffer, were he to move with his mother and stepfather to North Carolina." [2] She recommended that as between remaining in the Lehigh Valley with Father or moving with Mother to North Carolina, Joshua should be permitted to move. However, she did not interview Father or the current Mrs. Klingman, a fact which considerably limits the value of her recommendations. Moreover, she acknowledged Joshua's strong bond to his Father and stated, "In the best of all possible worlds, Joshua would not have to move. He would remain living close to his Father and his extended family." [3] I agree with this last statement.

Of course, this is not a perfect world, and sometimes job requirements do require a parent to move. Nevertheless, I do not believe that relocating Joshua to North Carolina would be in his best interests. And I am confident that Dr. Madeira will be able to find satisfactory employment much closer to the Lehigh Valley.

Mother and Dr. Madeira will be undoubtedly disappointed by my decision. They are fine people and have provided much love and affection to Joshua. I am sure they will continue to do so. My principal concern at this time is that Joshua may feel guilt at being the reason they are unable to move. I hope that Mother and Dr.

---

2. Plaintiff's exhibit 4, p. 1.
3. Plaintiff's exhibit 4, p. 4.

Madeira will make a special effort to assure Joshua that any such feelings on his part are unwarranted.

There is an old expression, "The grass is always greener on the other side of the fence." I think that applies here. That dream job in North Carolina may look wonderful from afar. Who is to say what the realities are? In any event, as I indicated initially, the focus of any court in a child custody matter is the best interests of the child, and I am convinced that Joshua's interests are not well served by such a distant relocation.

## ORDER

Now, August 16, 2001, after trial on plaintiff's "petition for modification of custody and for permission to relocate with the minor child" and defendant's "petition to modify custody order," for the reasons stated in the accompanying opinion, it is ordered as follows:

(1) Mother's petition to relocate with the minor child to Fayetteville, North Carolina, is denied.

(2) Father's petition to modify the custody order, seeking primary physical custody, is denied as moot.