## Orbegozo v. Orbegozo

C.P. of Berks County, no. 97-3486.

*Jaimee A.M. Dautrich,* for plaintiff.
*Daniel I. Sager,* for defendant.

LASH, *J.,* December 12, 2006—This court held a custody trial on December 7, 2006. The issue was primary custody of the parties' minor children, Starr Ashley Orbegozo and Katherine Orbegozo. This matter came to the court through a petition of plaintiff, Luis Orbegozo (Father), filed October 13, 2006, seeking a writ of ne exeat to enjoin defendant, Edna Orbegozo (Mother), from moving to Florida with the two minor children. On October 26, 2006, Mother filed a petition requesting permission to relocate to Florida with the two minor children. In lieu of proceeding to a hearing on the petitions, this court scheduled a trial to enable the parties to present all evidence sufficient to establish whether either of the petitions should be granted and whether the custody order entered in this case on December 15, 1999, shall be modified or remain in full force and effect.

The court makes the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Luis Orbegozo, is an adult individual who currently resides at 1220 North Sixth Street, First Floor, Reading, Berks County, Pennsylvania.

(2) Defendant, Edna Orbegozo, is an adult individual who currently resides at 2834 Somerset Park Drive, Tampa, Florida.

(3) The parties are the natural parents of Starr Ashley Orbegozo, born April 17, 1994, and Katherine Orbegozo, born December 12, 1996.

(4) The parties were married, but separated in either late 1996 or early 1997, becoming divorced in March 1998.

(5) In March of 1999, Mother married Jacob Maldonado, divorcing him in June 2006. Through this marriage, Mother bore two other children, Shenayah Maldonado, born September 4, 1999, and Shanti Maldonado, born July 22, 2003.

(6) Mother relocated to her home in Florida on or about October 31, 2006. Prior to that, she resided in Pottstown, since 1997.

(7) Mother's two other children, Shenayah and Shanti, have relocated with Mother to Florida, by agreement between Mother and the children's father, Jacob Maldonado. A custody arrangement has been agreed upon whereby Jacob Maldonado will have custody of his two children during the summer months.

(8) Father currently resides with his fiancée, Sanira Baez. The couple have resided together for approximately three years.

(9) On or about December 15, 1999, the Honorable Elizabeth Ehrlich entered an order setting forth that the parties would have joint legal custody of the minor children, with Father to have primary custody of Starr Ashley and Mother to have primary custody of Katherine. Additionally, the parties would alternate custody of the minor children every weekend from Friday at 5 p.m. to Sunday at 7 p.m., so that the children would be together each weekend. With the exception of some adjustments on pickup time, the parties have followed the terms of this order.

(10) The custody arrangement changed temporarily and by necessity when Mother relocated in Florida in October 2006. Starr Ashley remained at Father's residence, but Mother was unable to exercise her partial custody rights, based upon the relocation. Mother was prohibited from taking Katherine with her pursuant to a temporary writ of ne exeat issued by this court on October 13, 2006, in furtherance of the relief sought by Father within his petition for writ of ne exeat. Because Katherine expressed that she did not want to reside with her Father, she temporarily moved in with the maternal grandmother, Maria E. Oquendo, who resides at 601 South Nineteen Street, Reading, Berks County, Pennsylvania, and began attending the 16th and Haak Elementary School in the Reading School District. Father retained his partial custody of Katherine on weekends.

(11) Mother is currently employed at Adecco as an administrative assistant, working Monday through Friday from 8 a.m. to 5 p.m., with her first day of work being December 11, 2006.

(12) While Mother resided in Pottstown, she was employed by Verizon. Based on conversations with Verizon, Mother expected and believed she was promised a position with Verizon at her new home in Florida. Upon arrival, Verizon informed Mother that they have a policy that they cannot hire someone who resigned from Verizon, for a period of six months. As a result, Mother was unemployed for roughly a two-month period.

(13) Father is employed at Gabe's Lee Myles Transmissions, working Monday through Friday from 8 a.m. to 5 p.m. He also has a hobby working in his garage doing automotive repairs for his family and friends, which

he does on weekends when he does not have the children.

(14) Mother currently resides in the Hillsborough School District in Hillsborough County, Florida.

(15) Father currently resides in the Reading School District.

(16) Starr Ashley has attended parochial school at St. Margaret's Roman Catholic School. Katherine attended public school in Pottstown until this past September when, as stated, she began attending the 16th and Haak Elementary School.

(17) Both parties have relatives living in or near Berks County, Pennsylvania.

(18) Mother has some distant relatives and acquaintances who reside in Florida in the proximity of Hillsborough County.

(19) If Mother has custody of the children, she would have baby-sitting service available for them during the period that they are home from school until she returns from work. The baby sitter, Sonya Melendez, would be available for the entire day, if necessary.

## II. DISCUSSION

In determining primary custody, this court considered the testimony of the parties, Father's fiancée, Sanira Baez, Mother's ex-husband, Jacob Maldonado, the maternal grandmother, Maria E. Oquendo, Father's nephew, Mario Bolivar, a friend of the family, Mary Kreider, an in camera conference with the minor children, and the exhibits of the parties.

Mother presented first. She states that she decided she wanted to move to Florida because it is a quiet, safer

area, compared to Reading, which is too busy. The cost of living is lower. She wants to provide an attractive environment to rear her children.

During the course of her deciding whether to move, Mother approached Father to advise him of her thoughts. Her hope was that Father would agree and work out an arrangement where he would see the children during the summers, much as her other ex-husband, Jacob Maldonado, did. According to Mother, however, Father wanted to move to Florida with her and renew their relationship. When Mother made it clear that she was willing to work with Father for the children, but had no interest in him romantically, then Father would not agree to an arrangement. At some point, the parties were close to agreeing that Mother would move with Katherine and Father would maintain primary custody of Starr Ashley. At this time, the parties each want to have custody of both children.

Mother testified that Katherine has no relationship with her father. For a short time after the parties separated, Father had custody of both children. Unfortunately, during this time, when Katherine was approximately seven months old, she was scalded and suffered second- and third-degree burns. It was determined by Children & Youth Services that Father negligently supervised the children, and the children were removed from Father's care. Since that time, Mother has had custody of Katherine. Mother testified that Father belittles Katherine, calling her "fat" and insisting that she become more active in sports to help her to lose weight. Mother states that she and Katherine are extremely close and that it would be difficult for her to be separated from Mother for any length of time.

According to Mother, Father advised Mother that Katherine wanted to reside with him. Mother questioned Katherine on this, who became very upset, and stated she never said this.

Regarding Starr Ashley, Mother initially was prepared to move without her, however, through recent developments, it became apparent to Mother that she and Starr Ashley are developing a much closer bond and that Starr Ashley would thrive in her care. Mother states that Starr Ashley is unable to approach Father regarding personal issues, including her pubescence. Mother believes that Starr Ashley is not doing well in school and this is due to Father's failure to properly supervise her educational activities.

Mother also notes that if the children are not permitted to reside with her, they would have limited access to their two half sisters, who will be residing with Mother during the winter months and with their father in the summer. If Father has the subject minor children during the school year, the children would almost never be able to interact with the other children.

Mother promises to work with Father to provide him access to the children as often as possible. As stated, she is proposing that the children reside with Father during the summer months. She also states she would allow him to visit with the children whenever he could come to Florida and would also work with him for the Christmas and spring vacations, including flying the children back to Berks County, so long as she is not required to pay the expense. She will provide unlimited phone access.

On the other hand, Mother believes that Father would restrict the children's access to Mother if he had primary custody. She has had problems with him in the past. He presents as a person who wants to maintain full control and autonomy. She has been denied phone call access. In the same vein, he has made legal custody decisions without consulting her, such as enrolling Starr Ashley in a parochial school, which Mother opposes.

Father's initial argument is that Mother has failed to meet the burden required of her by the holding in *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990), and because of this, he should have primary custody of both children. Additionally, he believes that the children's best interests are served by awarding him primary custody. He believes that the separation caused by the distance between the parties is harmful to the children. He states that he is a better caretaker of the children, overseeing their school responsibilities. Father believes that St. Margaret's Catholic School provides better instruction because the classes are smaller and more attention can be devoted to each individual student. He also emphasizes school activities, such as basketball and soccer, urging that fitness is important to the welfare of the children. However, with the exception of the relocation, Father does not have any extensive complaints about Mother's parenting.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is "made on a case-by-case basis, [and] must be premised upon consideration of all factors which legitimately have

an effect upon [a] child's physical, intellectual, moral and spiritual well-being." *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

We also recognize that, due to Mother's relocation, this court must, in determining the best interests of the minor children, include the analysis established in *Gruber v. Gruber, supra.* In *Gruber,* the Superior Court set forth the standard to be utilized when the custodial party moves to a new residence a substantial distance from the other party. In such cases, the relocating party has the burden of production to show:

"(1) The potential advantages of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a monetary [sic] whim on the part of the custodial parent;

"(2)The integrity of the motives of both the custodial and noncustodial parent in either seeking the move or seeking to prevent it; and

"(3) The availability of realistic, substitute visitation arrangements which will foster adequately an ongoing relationship between the child and the noncustodial parent.

"*White v. White,* supra, 437 Pa. Super. [446] at 451, 650 A.2d [110] at 113, quoting *Gruber v. Gruber, supra,* 400 Pa. Super. at 184-85, 583 A.2d at 439. The factors to be considered are refinements of the basic standard which remains the best interest of the child. *Lee v. Fontine,* 406 Pa. Super. 487, 594 A.2d 724 (1991); see also, Pa. Family Law Prac. and Proc. [(3d ed.), §28-15, at 324], *supra.* Moreover, the fact that considerable distance will

increase the cost and logistical problems of maintaining contact between the child and the noncustodial parent does not necessarily preclude relocation when other factors militate in favor of it. *Id.*" *Gancas v. Schultz,* 453 Pa. Super. 324, 331, 683 A.2d 1207, 1210 (1996).

It is apparent that the benefits of Mother's move are minimal, and are more than offset by the disruption the move causes. There is little or no economic benefit. Mother is making less money and for a period of time was unemployed. She does enjoy a lower cost of living. The other reasons she gives, that the community is more peaceful and quiet than her previous residence in Pottstown, may well be true, but are not sufficient for her to meet her burden under the *Gruber* analysis. Further, there are locations within close proximity to Father's residence which could provide improvement on the quality of life issues.

On the other hand, her move has set in motion a separation between the two subject minor children and one of the parents, and potentially from the other two children who reside with Mother. In fact, the only resolution in which the four children would get to reside together would be if the court grants Mother's request, but that would also mean uprooting Starr Ashley from her primary home and limiting Father's contact with the minor subject children, for reasons insufficient under the *Gruber* analysis. Additionally, Mother is residing in a two-bedroom home, very likely too small for four minor children and herself.

While the benefits are not substantial, Mother's motives appear to be pure. Her goal is to provide a "better place to live" for her children, not to deny their father

access. Mother's other ex-husband testified that Mother is a very good mother, and he was more than willing to work with her on her move, so long as he would have liberal access to his children, including having them for the entire summer. Father was not able to articulate any concerns with Mother's parenting. Apparently, his objection is simply that he would no longer be living in close proximity to the children.

Beyond that, Father's motives are unclear, particularly with Katherine. Until the relocation issue came up, Father never sought custody of Katherine. He has no bond with her. According to Mother, Father was willing to agree to Katherine moving with Mother, until Father spoke with his attorney. Even after Katherine was required to remain in Pennsylvania due to this court's issue of the writ of ne exeat, Katherine has not resided with Father, but with the maternal grandmother. He has not provided this court with any reason why Katherine would benefit from remaining in Pennsylvania with him.

Because of the terms of the prior custody order, and the relationship between the parties and the children, this court must address each child separately. With regard to Katherine, while the relocation would provide her with only minimal benefit, and would separate her from her father, requiring her to remain in Pennsylvania, living with her father full-time could have serious adverse consequences. It is very apparent that Mother and Katherine have a very strong, loving bond. While at Father's house, Katherine appears to do little more than exist. No one has been able to establish that an extensive separation from her father would have any adverse impact on

Katherine, because she has no relationship with Father at this time. Interestingly, Father has no current access to Katherine during the week, because he has no phone number for the maternal grandmother. Apparently, he and the maternal grandmother do not get along. Thus, despite the fact that the maternal grandmother has no custody rights to Katherine, Father has no problem with having no contact with Katherine, except every other weekend, as he had under the terms of the custody order.

In *Tripathi v. Tripathi,* 787 A.2d 436, 441 (Pa. Super. 2001), the Pennsylvania Superior Court reiterated the important principle that in determining child custody cases, the best interest of the child is paramount, even when the presence of a relocation warrants review of the other factors enumerated in *Gruber.* The Superior Court states:

"The *Gruber* court took pains to assert that 'achieving "the best interests of the child" remains the ultimate objective in resolving all child custody and related matters,' but only emphasized 'that the best interests of the child are more closely allied with the interests and quality of the custodial parent and cannot, therefore, be determined without reference to those interests.' *Id.* [400 Pa. Super.] at 183, 583 A.2d at 437-38.

"While we acknowledge the refinements posited in *Gruber* in relocation cases, they do not create a new standard and we hasten to stress the polestar of our analysis in this case, just as it was in *Gruber* and a legion of prior custody cases, remains the best interests of the child, . . . ."

Under the circumstances of this case, it would be improper for this court to end Mother's primary custody of Katherine because of the circumstance of relocation. This court can find no positive reason for separating Katherine from her mother or in placing Katherine with her father, other than the fact that Katherine would reside with her sister, Starr Ashley. We will not overlook the obvious needs of the child in favor of a robotic application of the *Gruber* standard.

In Starr Ashley's case, however, Father has been primary custodian. The evidence has established factors both in favor of and opposing Starr Ashley's relocation with her mother. The biggest argument in Mother's favor is that this would enable Starr Ashley to reside with her sister and her two half sisters, while if she resides with Father, the contact, particularly with her half sisters, would be extremely limited. Other factors in Mother's favor include the fact that Starr Ashley wants to develop a better relationship with her mother and that Starr Ashley is not thriving academically in her current setting. On the other hand, Father, overall, has provided a satisfactory home for Starr Ashley. Father's paramour appears to be a positive role model for her and can be a resource, when Mother is not available. Starr Ashley also appears to be someone who would prefer Mother's more lenient approach to discipline, which may not be entirely beneficial.

The Superior Court in *Tripathi* also states: "when the petitioning parent is not the custodial parent and, as here, never has been the primary custodial parent, short of a determination that the custodial parent is unfit or that

there is some unique and highly beneficial benefit to the child in relocation, the burden faced by the noncustodial parent seeking relocation of the child is a very heavy one." *Tripathi,* at 442.

On balance, the evidence does not support a relocation for Starr Ashley. The court, therefore, awards continued primary custody with Father, with Starr Ashley to have extensive time with Mother during the summer months, at Christmas and spring holidays, and at other times as the parties can arrange.

The court's rulings mean that the children will live separate and apart, at least during the school year. Because of this, this court will split the summer such that the children will reside together for the entire summer, half of the time at Mother's residence and half at Father's residence. Unfortunately, this court cannot fashion a remedy under the law which would permit Starr Ashley to spend any significant time with her half sisters. Hopefully, during the time in the summer when Starr Ashley and Katherine reside at Father's home, arrangements can be made between Father and Jacob Maldonado, perhaps with Mother as an intermediary, to enable the four children to spend some time together.

This court also instructs the parties that the best situation for the children would be if the children all resided within close proximity of each other. This would mean, however, that Father would have to agree to allow Starr Ashley to move to Florida or Mother would have to decide to relocate back to Pennsylvania. As the parties begin to settle into their new schedules, they should closely examine the benefits and problems with this new

arrangement to determine whether some other alternative is more appropriate. In any event, the parties should work together so that the children can interact with all members of their family.

We enter the following order:

## ORDER

And now, December 12, 2006, after trial held, custody of the parties' minor children, Starr Ashley Orbegozo, born April 17, 1994, and Katherine Orbegozo, born December 12, 1996, shall be as follows:

(1) The parties shall share legal custody.

(2) Plaintiff, Luis Orbegozo (Father), shall have primary custody of Starr Ashley during the school year.

(3) Defendant, Edna Orbegozo (Mother), shall have primary custody of Katherine during the school year.

(4) The parties shall share custody during the summer months by splitting the time equally. This court recognizes that the school schedule may differ between Florida and Pennsylvania, so the parties should adjust accordingly to enable both of them to have equal time with the two children and to enable the two children to spend as much time with each other as possible. Accordingly, it would be most feasible if the child whose school year ends first would travel to the home of the noncustodial parent for the first half of the summer. However, the parties can work out the schedule to their mutual satisfaction.

(5) The parties should share custody during the Christmas and spring break vacations from school, such that

the children could reside together for both vacation periods. The parties shall alternate these two vacations, such that Father should have the children for the Christmas vacation for one school year with Mother to have the spring vacation for that same school year, alternating every other year.

(6) Either party may travel to the location of the other party to visit with the children upon giving 48 hours notice.

(7) The parties shall share transportation expenses equally.

(8) Both parties shall provide unlimited access of the noncustodial parent to the children, either through telephone, or e-mail.

(9) The petition of plaintiff, Luis Orbegozo, for writ of ne exeat and the petition of defendant, Edna Orbegozo, requesting permission to relocate to Florida are both denied as moot. The order entered October 13, 2006 granting a temporary writ of ne exeat is vacated.

(10) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these

general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the children and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the children shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the children as he or she desires consistent with the proper medical care of the children.

(3) Neither party shall alienate nor permit to attempt to alienate the children from the other party. While in the presence of the children, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the children should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall, at all times, consider the children's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor children.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.