**Angstadt v. Ament**

*Sharon L. Gray,* for plaintiff.
*Kurt B. Geishauser,* for defendant.

LASH, *J.,* February 5, 2010—The matter before this court is the custody complaint of plaintiff, Erica Angstadt (Mother), and the petition of defendant, Stephen James

Ament (Father), for permission to relocate with the parties' minor children. A child custody trial was held on February 2, 2010. We enter the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Erica Angstadt (Mother), is an adult individual who currently resides at 1107 Showers Lane, Muhlenberg Township, Berks County, Pennsylvania 19605.

(2) Defendant, Stephen James Ament (Father), is an adult individual who currently resides at 125 Sumner Avenue, Forest Hills, Allegheny County, Pennsylvania.

(3) The parties are the natural parents of AJA, born October 20, 2000, and AMA, born October 15, 2001, (minor children).

(4) The parties are divorced, a divorce decree being entered on November 5, 2004. They initially separated in January 2003. At that time, Mother moved in with the maternal grandmother in her house in Leesport, Berks County, Pennsylvania.

(5) From January 2003 to June 2003, Mother and the minor children resided with the maternal grandmother.

(6) Sometime in April of 2003, after receiving a report of alleged abuse of the minor children, the Berks County Children & Youth Services (CYS) obtained a temporary placement of the minor children with the maternal grandmother, pending investigation. Mother was limited to supervised visits.

(7) In June 2003, Mother moved in with James Kaas, who became her paramour and remains so to this day. At that time, they resided at 209 Verdure Lane, Douglassville, Berks County, Pennsylvania. They remained in that home until sometime in 2006 or early 2007. However, Mother and her paramour separated approximately three times, resulting in Mother moving in temporarily with her friend, Dianna, or back in with the maternal grandmother.

(8) Meanwhile, the minor children continued to reside with the maternal grandmother until August 2, 2006, when the minor children were placed by CYS with Father. Mother's visits were supervised throughout this time.

(9) Sometime in late 2006 or early 2007, Mother and her paramour moved to Union Street in Birdsboro and resided there until they moved to 27 South 23rd Street, Mount Penn, Berks County, Pennsylvania, where they leased a house for approximately six months.

(10) On December 29, 2009, Mother and James Kaas moved to their current residence.

(11) From April 2003 through July 18, 2007, the minor children were dependent, subject to the custody of CYS, and as stated, resided with the maternal grandmother from April 2003 to August 2, 2006, when the minor children were placed with Father. On July 18, 2007, the dependency order was terminated. The minor children were ordered to remain in Father's custody until further order, with any visitation with Mother to continue to be supervised.

(12) Despite the terms of the order, the parties began an informal arrangement whereby Father had primary

custody, with Mother to have unsupervised visits on alternate weekends and two evenings per week.

(13) The informal arrangement continued until July of 2008, when CYS reopened the case, after receiving a report from a doctor concerning a bruise on AJA's rear end. The bruise was caused by Father spanking AJA after AJA got in trouble on the school bus. CYS permitted custody to remain with Father. At Father's insistence, the parties returned to the terms of the existing custody order, meaning Mother was again relegated to supervised visits.

(14) Mother's visits were supervised, at times by the maternal grandmother, at times by Father, and generally through Signature Services, who conducted two-hour visits on a weekly basis.

(15) Mother filed the within petition on December 18, 2008, requesting primary custody of the minor children.

(16) On or about August 12, 2009, Mother filed a petition for emergency relief and custody, requesting a cessation of the requirement that her visits be supervised, stating that her funded supervised visitation with an agency, Signature Services, ended on August 1, 2009, and because Mother's maternal grandmother was diagnosed with Stage 4 cancer, and Father was refusing to allow the minor children access to her without his presence. Father responded by filing a motion to dismiss Mother's request for emergency relief.

(17) The petition was resolved through the parties reaching a stipulation, which was entered as an order of court on November 9, 2009, setting forth that the parties

would share legal custody with Father to have primary physical custody and Mother to have partial physical custody, which would be unsupervised, every other weekend and every other Wednesday overnight into Thursday a.m. The order also provided a holiday schedule for Thanksgiving and Christmas 2009.

(18) At all pertinent times from the separation until October 2009, Father resided at 1101 Mount Laurel Avenue, Temple, Berks County, Pennsylvania 19560, with his wife, Samantha. The couple have a son, Brennan, born October 5, 2006. As stated, the minor children resided with Father since August 2, 2006.

(19) During the pendency of the petition for emergency relief, Father filed a petition for relocation, requesting that he be permitted to relocate to Forest Hills, Allegheny County, Pennsylvania, near Pittsburgh. Father alleged that the relocation was necessary because he was unable to find employment locally in his occupation as a welder, causing financial hardship, but was able to secure a job as a welder in the Forest Hills, Pennsylvania area.

(20) Father and his spouse have now relocated. Pending disposition of the custody action, the minor children have relocated to the home of the maternal grandmother and continue to attend school in the Muhlenberg School District.

(21) Mother currently resides with her paramour, James Kaas. Mr. Kaas has two children, Tristan, age 13, and Justin, age 10. Mr. Kaas has partial custody rights on alternate weekends. Also residing with the couple is Mr. Kaas' 19-year-old niece, who has special needs. The

parties reside in a three-bedroom home, with the couple residing in one bedroom, the subject minor children in a second bedroom, Mr. Kaas' children in the third bedroom, and Mr. Kaas' niece in the recreational room area.

(22) Mother's living accommodations appear sufficient for the care of the minor children.

(23) Father's current residence is in a quiet neighborhood, with the school the minor children would attend approximately a mile away and with sufficient recreational opportunities. Father's home appears to be sufficient for the care of the minor children.

(24) Mother currently resides in the Muhlenberg School District, and Father in the Woodland Hills School District.

(25) By agreement of the parties, this court ordered an independent psychological evaluation to be conducted by a licensed psychologist, Alison L. Hill Ph.D., of Berks Counseling Associates P.C. Dr. Hill conducted several interviews with the parties and the minor children and Mother's husband, James Kaas, on July 22, 29, August 12, 19, September 14, October 21, and November 10, 2009. She also administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the Parent Awareness Skills Survey (PASS), and obtained information from the parties through a parent questionnaire, as well as obtained child abuse and criminal clearance certifications. The report was completed at the end of 2009.

(26) The parties currently reside approximately four hours apart.

290

(27) Mother is employed as a certified nurse assistant, working at Health Calls for four to six hours every other weekend, where she attends to patients at their homes, and at St. Joseph's Hospital-Berks Vascular, Monday through Friday. On Monday, Tuesday, and Thursday, she works from 9 a.m. to 5 p.m., on Wednesday from 1 p.m. to 5 p.m., and on Friday from 9 a.m. to 12 noon.

(28) Father is employed as a welder/fitter through a union-based agency known as Tradesmen International, who obtain jobs for him as a welder/fitter. He is available for employment for 40 hours per week, with the hours contingent upon what is required by the employer. His jobs involve prefabrication of steel.

## II. DISCUSSION

The parties are each seeking primary physical custody. In making disposition, this court considered the testimony of the parties, Mother's paramour, James Kaas, Father's wife, Samantha Ament, CYS supervisor Melisa Clarke, Signature Services caseworker Mary Jimenez, Signature Services supervisor and former caseworker, Patrice Gangemi, the testimony and report of Alison L. Hill Ph.D. and the exhibits submitted by the parties. By agreement, the parties did not present the minor children for an in camera conference.

Mother presented first. She states she would provide a strong household for the minor children. She and her paramour have a long-standing, stable relationship, and have now chosen a residence which would meet the minor children's needs. The minor children would be

able to remain in the Muhlenberg School District. She states that her house is orderly, requiring rules, without chaos, in contrast to Father's.

Mother admits that for a time, she presented issues as a parent. She states that she is more stable and mature now. She acknowledges that she failed to cooperate with CYS during their involvement and states she should have done so.

Regarding Father, she believes that his house is unstable. When the minor children arrive at her house, they are often dirty and require a bath. One of her children, AMA, has eczema, which Mother contends Father fails to treat properly. She also argues that the other child, AJA, has impetigo, which Father refuses to acknowledge.

Mother states that Father has withheld the minor children from her. For a time, she had unsupervised visits, but this was withdrawn by Father after he was reported to CYS for excessively spanking the elder child. He refuses to acknowledge her or her family and does not permit them to become involved in the minor children's affairs.

Mother objects to Father's request to relocate. Relocation means that the minor children will live approximately four hours apart. If Father had remained in Muhlenberg School District, he and Mother would have residences very close together. Mother believes that Father's reason for the relocation, that he could not obtain a position as a welder/fitter in Berks County or nearby, is contrived. She urges that he should be able to obtain suitable employment in the labor field without having to

relocate as far away as the Pittsburgh area. She questions whether he is even qualified as a welder. She notes his unstable employment history, having left several jobs in the last few years.

Father presents a very different picture. He sets forth that the minor children's lives have improved substantially since he has obtained primary custody. Their behavior, both at home and at school, has improved. For example, AMA can sometimes be difficult, acting out on occasion, but that problem has been alleviated.

Father sets forth that his household is a stable one. He has been married for four and one-half years to his wife. They have a child together who gets along well with the subject minor children. Father has been active in the minor children's school lives, as well as recreation. The minor children enjoy sports, including baseball, football, and wrestling, and Father has coached them while he was a resident of Berks County, and intends to offer his services as a coach in his new location. He helps the minor children with their homework and believes his discipline is appropriate. He acknowledges that he spanked AJA on one occasion, and was shocked when he saw the mark left on his rear end. Accordingly, he no longer uses corporal punishment.

Father has received a good report from CYS and Signature Services. All believe the minor children's behavior and demeanor have improved since Father has assumed custody. Father has participated in the services required by the agencies. Melisa Clarke of CYS noted that the minor children were doing well in school, were enjoying sports, and had no behavior issues while with Father.

Father points to Mother's poor track record as a parent and on personal matters. Except for the one-year period after Father assumed custody and until recently, she was limited to supervised visits of the minor children, at the recommendation of CYS. She had difficulties with CYS and refused to cooperate with them. Mother was cited by CYS as having inappropriate parenting, marital conflicts and mental health issues. She also had difficulty with Signature Services. Signature Services mentioned Mother's propensity to involve the minor children in inappropriate discussions regarding the court proceedings, her issues with Father, and so forth. After cautioned not to do this, Mother insisted on doing so stating she refuses to "lie to her kids."

CYS documented several statements which they allege Mother made to them, which she now denies. This includes a statement that she intended to seek termination of her parental rights through court proceedings. Father also challenges Mother's credibility on her health issues. Mother has many complaints, including suffering meningitis, Wolff-Parkinson's white syndrome, post-traumatic stress disorder, panic attacks and depression. This problem extends to Mother's insistence that AJA has impetigo, which was diagnosed by Mother's doctor but refuted by Father's.

Father believes that Mother is unstable. He cites to her frequent relocations. Additionally, she separated from her paramour three times.

Father believes the move to the Pittsburgh area will be very beneficial. In addition to having steady employment, the cost of living is lower. The neighborhood is

quiet and friendly. Everything is close by, including a YMCA which is only a couple of miles down the road.

While Father insists on primary custody, he is willing to make the drive once a month to enable Mother to see the minor child, and agrees to Mother having extended time during the summer months.

Dr. Hill provided an extensive psychological evaluation. She recommended that Father retain primary physical custody of the minor children. The recommendation took into account the move to the Pittsburgh area. She cites Father's stable household and correspondingly Mother's overall lack of stability. Dr. Hill believes that Mother would experience financial and emotional difficulty in meeting the needs of the minor children if she was required to care for them on a full-time basis. Dr. Hill believes that Mother should have partial custody, unsupervised on alternate weekends, and additional time during school vacations, holidays, and in the summer. Again, this takes into account Father's move to the Pittsburgh area and the inconvenience of the long drive for the parties and the minor children.

In making this determination, Dr. Hill found Father to be extremely involved in the minor children's lives. She references his contact with the principal at school regarding issues which arise there, his helping to coach AJA's sports teams, his willingness to seek counseling for the minor children, and his overall caretaking. Dr. Hill finds Father's household to be very stable and intact. She believes Father's parenting skills are good, with appropriate techniques for disciplining the minor children. He establishes and maintains structure and consistency for them, providing communication of his expectations.

Mother, on the other hand, according to Dr. Hill, has been inconsistent. She is not able to provide extensive background information on the minor children. She has been uncooperative with CYS. Her instability is also demonstrated with her current fiance, as shown through their separations. There has also been domestic violence issues between them, even to the extent where police have been called.

In her reporting to Dr. Hill, Mother contradicted herself, as well as documented information. For example, Mother denied ever striking the boys, but later admitted that she had smacked AMA in the face, cutting his lip.

Dr. Hill states that Mother's basic parenting skills are acceptable, noting her love for the minor children. Dr. Hill is concerned, however, with Mother's propensity to make statements to the minor children "for the purpose of upsetting or scaring them." which only serves to upset the minor children and create insecurity and a sense of instability. Dr. Hill is also concerned that Mother and the maternal grandmother have reportedly made statements to the minor children that they won't see Mother again if they do move to the Pittsburgh area with Father.

In her observation of the minor children, Dr. Hill noted a very strong bond with Father, interacting on a positive and relaxed level. AJA also displayed a bond with Mother and had some positive interaction. Regarding AMA, while Mother has a positive relationship with AMA, the attachment is not as strong as with Father.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A

determination of what is in the best interests of a child is made on a case by case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

We also recognize that due to Father's relocation, this court must, in determining the best interests of the minor children, include the analysis established in *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990). In *Gruber,* the Superior Court set forth the standard to be utilized when the custodial party moves to a new residence a substantial distance from the other party. In such cases, the relocating party has the burden of production to show:

"(1) The potential advantages of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a monetary (sic) whim on the part of the custodial parent;

"(2) The integrity of the motives of both the custodial and noncustodial parent in either seeking the move or seeking to prevent it; and

"(3) The availability of realistic, substitute visitation arrangements which will foster adequately an ongoing relationship between the child and the noncustodial parent.

"*White v. White, supra,* 437 Pa. Super. [446] at 451, 650 A.2d [110] at 113 [1994], quoting *Gruber v. Gruber, supra,* 400 Pa. Super. at 184-85, 583 A.2d at 439. The

factors to be considered are refinements of the basic standard which remains the best interest of the child. *Lee v. Fontine,* 406 Pa. Super. 487, 594 A.2d 724 (1991); see also, Pa. Family Law Prac. and Proc. [(3d ed.), §28-15, at 324], *supra.* Moreover, the fact that considerable distance will increase the cost and logistical problems of maintaining contact between the child and the noncustodial parent does not necessarily preclude relocation when other factors militate in favor of it. *Id.*" *Gancas v. Schultz,* 453 Pa. Super. 324, 331, 683 A.2d 1207, 1210 (1996).

Mother's issue with the relocation is well taken. We acknowledge that jobs are generally hard to come by in the current economy. Further, Father's status as an employed worker is certainly preferable to receiving unemployment compensation. However, Father's relocation appeared to be somewhat impulsive, for he initially obtained a lease for his current residence, prior to having a job secured.[1] Father could have made more of an effort to obtain a suitable job in the immediate vicinity. By moving to Pittsburgh, he created a separation, making it difficult for the minor children to have access to both parents. We also note Father's sporadic employment history, changing jobs frequently, establishing that there is often dissatisfaction between Father and his current employer. The same could take place in Pittsburgh.

While we are not impressed with Father's reasons for the relocation, we observe that there is nevertheless much

---

1. He testified that he believed he had a job, but the prospective employer backed out because he did not act quickly enough to obtain the employment and because the prospective employer became aware of the current court proceedings.

more to consider. The *Gruber* analysis must be considered in context, with the overriding concern being the best interests of the minor children. In *Tripathi v. Tripathi,* 787 A.2d 436, 441 (Pa. Super. 2001), the Pennsylvania Superior Court reiterated the important principle that in determining child custody cases, the best interest of the child is paramount, even when the presence of a relocation warrants review of the other factors enumerated in *Gruber.* The Superior Court states:

"The *Gruber* court took pains to assert that 'achieving "the best interests of the child" remains the ultimate objective in resolving all child custody and related matters,' but only emphasized 'that the best interests of the child are more closely allied with the interests and quality of the custodial parent and cannot, therefore, be determined without reference to those interests.' *Id.* [400 Pa. Super.] at 183, 583 A.2d [434] at 437-38.

"While we acknowledge the refinements posited in *Gruber* in relocation cases, they do not create a new standard and we hasten to stress the polestar of our analysis in this case, just as it was in *Gruber* and a legion of prior custody cases, remains the best interests of the child, . . . ."

It is evident from this record that it is not in the minor children's best interests to award primary custody to Mother. She has had only supervised visits for approximately five and one-half of the last seven years. This is totally inconsistent with responsible parenting. Secondly, her bond with the minor children is not strong, according to the psychologist. Third, she has a history of creating conflict, as evidenced by her inappropriate statements to the minor children and her poor relationship

with the various agencies. Her denials of statements she made to CYS, which were documented by CYS, and which, if made, call into question her capacity as a parent, are simply not credible. This court is not satisfied that Mother is currently capable of assuming the role of a full-time parent. On the other hand, Father's track record has been established, both by the growth and behavioral improvement of the minor children, and the observations of the various agencies.

The *Gruber* analysis is an important concern in child custody matters, for it protects an involved parent from losing contact with a child due solely to the selfish or random decision of a custodial parent to relocate a substantial distance from the aggrieved parent. However, as noted by *Tripathi,* the *Gruber* analysis was never meant to supersede or supplant the best interest analysis. It cannot be used to provide a basis for establishing transfer of custody "by default." This court's only alternative here is to permit custody to remain with Father.

Since the fall of 2009, Father has had no objection to unsupervised visits. We agree that Mother is capable of performing her duties as a parent in a partial custody context. Accordingly, Mother will be granted the summer months, with the exception of a two-week vacation time for Father, and will also receive a weekend every six weeks during the school year. While Father stated that he would agree to a visit every four weeks during the school months, we must also take into account the length of the trip, which is onerous to a child who will be required to be in the car for eight hours over a two-day period. Six weeks is a better stretch of time. Mother will also be permitted time during the Christmas vacation and the spring break.

We enter the following order:

## ORDER

And now, February 5, 2010, after trial held, custody of the parties' minor children, AJA, born October 20, 2000, and AMA, born October 15, 2001, (minor children) shall be as follows:

(1) The parties shall share legal custody.

(2) Defendant, Stephen James Ament (Father), shall have primary physical custody.

(3) Plaintiff, Erica Angstadt (Mother), shall have partial physical custody as follows:

(A) During the summer months, defined as commencing one week at the expiration of the school year until one week prior to the start of the next school year, with the exception of two weeks to be taken by Father for vacation purposes, Father's weeks to be either consecutive or nonconsecutive at his discretion, providing Mother's 30 days written notice of the dates and times for his vacation;

(B) Once every six weeks during the school year, commencing sometime Friday to sometime Sunday, contingent upon the parties' transportation schedule. The parties shall share the transportation equally, either by meeting at a location equidistant from the parties' respective homes, or through one party traveling the full distance between residences on Friday and the other traveling that distance on Sundays, to be agreed upon by the parties. If the parties cannot agree, then Mother shall pick up the minor children on Friday after they have finished school

and Father shall pick up the minor children on Sunday at 5 p.m. after Mother has provided them with dinner;

(C) During the Christmas and spring breaks, with the Christmas vacation to be from December 26 to one day prior to the resumption of school, and on spring break from one day after the start of the school recess until one day prior to the resumption of school; and

(D) At such other times as the parties may agree.

(4) Mother may visit with the minor children for several hours on a weekend if she travels to Father's location for that purpose, upon providing Father at least 14 days written notice of her intention. If Mother exercises this option, she shall not be permitted to remove the minor children from Allegheny County.

(5) One of Mother's weekends shall be on Mother's Day weekend.

(6) At any time, a party not having custody of the minor children may make reasonable telephone calls to the minor children. Further, this court recommends, but does not require, the parties purchase a computer with a webcam to enable the minor children to visit with the noncustodial parent through computer access.

(7) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on

both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the children and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the children shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the children as he or she desires consistent with the proper medical care of the children.

(3) Neither party shall alienate nor permit to attempt to alienate the children from the other party. While in the presence of the children, neither parent shall make any remarks or do anything which is derogatory or uncom-

plimentary to the other and it shall be the duty of each parent to uphold the other parent as one the children should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall, at all times, consider the children's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make

choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor children.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.