**Weidemoyer v. Pomer**

C.P. of Lehigh County, no. 2000-FC-0861.

*Thomas M. Joachim*, for plaintiff.
*James C. Sommar*, for defendant.

FORD, *J.*, November 24, 2010—This custody dispute involves two decent, unmarried young adults and their two-year-old daughter, Claire. The parties lived together in Pennsylvania before Claire's birth and for a period of time after her birth. They separated and resided in different locations in Pennsylvania. Recently, defendant, Colin Pomer (Father), relocated from Pennsylvania to Vermont to pursue an employment opportunity. He filed petitions for relocation and to modify an earlier custody order. In his petitions, he asks that he be granted either primary physical custody or shared physical custody of Claire. Father's trial presentation was directed toward his receiving shared physical custody.

Plaintiff, Sarah Weidemoyer (mother), filed a complaint for custody. She also filed a pleading objecting to father's petition to relocate with Claire. She is seeking to be named Claire's primary physical custodian.

After a trial on the various petitions of the parties, conducted on October 20, 21, and 22, 2010, I concluded that Claire's best interests require that the parties share legal custody of Claire, that mother be the primary physical custodian and that father be given meaningful partial custody.

## Findings of Fact

1.  Mother and father are both 22 years of age. Both matriculated at DeSales University in Center Valley, Pennsylvania, to begin their freshman year in the fall of 2006. They met during freshman orientation. After a period of dating each other, they moved from campus and lived together in one and then another apartment in Coopersburg, Lehigh County, Pennsylvania.

2.  While they resided together, mother became pregnant. She delivered Claire Pomer on December 30, 2007. The parties had plans to marry, but they later cancelled their wedding plans. They resided together until September of 2009 when father moved from the second Coopersburg apartment to an apartment that he rented alone in Hellertown, Northampton County, Pennsylvania. Mother's Coopersburg apartment was approximately twenty minutes driving time from father's Hellertown apartment.

3.  At a conference with Lehigh County's custody hearing officer, the parties reached an interim agreement for custody of Claire whereby they shared legal custody of Claire and they shared physical custody by exchanging Claire every day. Claire also attended daycare during this time. The schedule was difficult and confusing for Claire.

4.  Mother moved from the second apartment in Coopersburg to the home of the maternal grandmother's cousin, Laura Gross, and her family in Bethlehem, Pennsylvania in July, 2010. Mother remained in Ms. Gross's home until October, 2010. In that home, mother had her own room that she shared with Claire. Approximately one week before the trial in this case, mother moved from Ms. Gross's home to her parents' home in Perkiomenville,

Montgomery County, Pennsylvania. Mother's move to Ms. Gross's Bethlehem home was motivated by mother's employment plans and by a desire to make the joint physical custody that existed at that time easier for both parties and Claire. Her move to her parents' home was motivated by a combination of factors including family support, employment, and her education plans.

5. Mother works as a waitress at Applebee's Restaurant in Quakertown, Pennsylvania with hours that vary each week between 25 and 45. She began that employment in the fall of 2010. For the summer of 2010, she worked at a sandwich shop. Before that, she worked at a daycare center for approximately one and a half years. Mother has plans to begin studies in early 2011 for a career in nursing. She has narrowed her search to two nursing programs.

6. In addition to her parents, mother lives with her two siblings, Maria Weidemoyer who is a seventeen-year-old high school senior and Molly Weidemoyer who is ten years old. Molly is a special needs child who has severe developmental delays due to low muscle tone. Mother's parents provide financial and emotional support for mother.

They also support mother in her plans in regard to education and employment. The home in which mother presently lives is happy and healthy in all respects.

7. Father graduated from DeSales University in May 2010 with a bachelor of science degree in accounting.

8. Father had various part-time jobs, work-study positions, and internships during his four years at DeSales. In 2009, he began a serious job search with the goal of securing employment in the accounting field. His efforts

were concentrated in the New England and Pennsylvania areas. Father received only one offer of employment which came from National Life Insurance Company ("National Life") in Montpelier, Vermont. Father accepted the offer in July, 2010. He now works there as a staff accountant at an annual salary of $40,000. He has a benefit package which includes Claire as a beneficiary.

9. Since September 2, 2010, father resides in Waterbury Center, Vermont where he lives with Claire. The home is part of an old farmhouse that was recently converted to an apartment building. It is pleasant, comfortable, and in a fine setting in all respects. The drive time from father's home to mother's home is approximately six and one half hours.

10. Father was raised in Lyndeborough, New Hampshire. He has a sister, Alyssa, who resides in Binghamton, New York, where she is a graduate student. Father's mother is deceased. His father, John Pomer, resides in Lyndeborough with Ellen Pomer, father's step-mother. John Pomer and mother have had a falling out primarily over the wedding plans and the ill feelings continue. A substantial portion of father's family resides in Vermont and New Hampshire. Several of father's aunts and his maternal grandparents live approximately 15 to 20 minutes away from him. These relatives provide emotional support for father. They have already done some babysitting of Claire and have convincingly offered their services to assist father in taking care of Claire. They also offered help for father when any need arises.

11. Father took the position in Montpelier because of what it had to offer in terms of salary, benefits, work in his field of study, and proximity to his family of origin. Father

intends that his position will be permanent with National Life.

12. At present, father does not have a girlfriend. Mother has a boyfriend, Christopher Morrotto, since July of 2010. Mr. Morrotto attends a community college and works part-time at a local country club. He lives with his parents.

13. Mother's family assists in babysitting Claire when the need arises. Mother also uses daycare for Claire. Claire has adjusted well to this daycare and is happy there. Father plans on using a daycare in Vermont during custodial times when he will have Claire.

14. Since father has moved to the Vermont area in August of 2010, Claire has lived with him for 18 days (to the date of trial). This included the period when mother went on a vacation with Mr. Morrotto and his family to North Carolina.

15. During her pregnancy, mother engaged in considerable self-education, primarily by reading and talking with others, about how to take care of a young child. She also underwent formal parenting education. Father recently completed a six-week parenting education course. Both parties completed Lehigh County's COPE (co-parenting dducation) program.

16. Mother scheduled doctors' appointments for Claire. Father scheduled doctors' appointments if mother asked him to do that. While the parties resided together, both parents attended doctors' appointments for Claire. After the separation, Father did not attend any appointments. Mother consistently advised father of the information about all doctors' appointments for Claire in advance of them. It

was not father's practice to call mother after the doctors' appointments to inquire about what occurred at them. On the other hand, it was mother's practice to contact father to advise him of events at the appointments.

17. In large part, father does not give information to mother on significant topics that parents need to know. Father often did not respond to specific questions by mother about Claire. At other times, he gave one word answers to mother's inquiries about Claire or father changed the subject when mother asked questions about Claire. On many days when father had custody of Claire, father would not put Claire on the phone with mother to say hello despite requests by mother to talk with Claire. Father has infrequently called mother from Vermont to speak with Claire. Since separation, mother regularly contacted father and has been forthcoming to father with important information about Claire during mother's custodial time. During father's custodial time, mother consistently contacts father, asks information about Claire, and she attempts to speak with Claire to extend a greeting.

18. Father's job search took place over a period of one year from July of 2009 to July of 2010. During that period of time, father did not advise mother that he was looking for positions in New England. The letter containing the offer of employment to father from National Life was dated July 14, 2010. Father accepted that offer on July 19, 2010. Father filed his "notice of oroposed relocation" on July 30, 2010. He advised mother of the National Life job in late July just before the filing of the relocation notice. He told mother he had just been offered a position at National Life in Vermont, that he accepted the position, and that he and Claire would be moving. Approximately one week later, father moved to Vermont.

19. Mother has said some things in the presence of Claire about other adults that are not appropriate. The parties have engaged in inappropriate arguments in front of Claire.

20. Before father's securing the position with National Life, Claire had medical insurance through Medicaid.

21. Both parties love Claire. They want to be involved in Claire's life to the fullest extent possible

Discussion and Conclusions of Law

Counsel for the parties have cited most of the applicable legal principles for decision in this matter. As the court and counsel recognize, the paramount consideration in a custody case is the best interests of the child. *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992). In my attempts to determine Claire's best interests, I considered "all factors which legitimately impact upon the child's physical, intellectual, moral and spiritual well-being." *Zummo v. Zummo*, 574 A.2d 1130, 1137 (Pa. Super. 1990).

As an aid in focusing on what is in the best interests of a child in a relocation situation, the Pennsylvania Superior Court set forth factors for the trial court to consider. The factors are:

First, the court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent.....

Next, the court must establish the integrity of the

motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it....

Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent *Gruber v. Gruber*, 583 A.2d 434, 439 (Pa. Super. 1990).

In *Thomas v. Thomas*, 739 A.2d 206 (Pa.Super. 1999), the Superior Court commented on the proper considerations for a trial court when addressing a request for a change of custody and relocation in the context of an equally shared custody arrangement. (An equally shared custody arrangement was not the setting in the *Gruber* case.) The Superior Court stated as follows:

[W]e are reviewing a request for change of custody and relocation in the context of an equal shared custody arrangement. As such, *Gruber's* mandate that the court is to focus on the primary physical custody family, and what is "advantageous to the primary unit is obviously in the best interests of the children," is not applicable in this case. Here, there exists two primary family units, and, as such, we conclude that "both must be scrutinized similarly in the examination of competing custodial environments....*Id.* at 210-11 (citations omitted).

The Superior Court further explained in *Thomas* that,

[i]n considering the prospective advantages to the move, a court shall not limit itself solely to enhanced economic opportunities for the custodial parent, but must also assess other possible benefits of the location... We emphasize...that courts are not free to ignore or discount non-economic factors which are likely to

contribute to the well-being and general happiness of the custodial parent and children. *Id.* at 211.

Subsequently, the Superior Court, citing *Thomas*, held that, in analyzing the two competing custodial environments, the trial court should consider each parent's job stability, employment opportunities, housing, neighborhoods, other relevant factors and, of course, the best interests of the children. *McAlister vs. McAlister*, 747 A.2d 390, 392 (Pa.Super. 2000).

Father has not met his burden of proof in trying to establish the first *Gruber* factor. He has not established that moving Claire to Vermont under the physical custody arrangement that he suggests or any shared physical custody arrangement would significantly improve the quality of life for him and Claire. In considering the first *Gruber* factor, I took into account not only the economic opportunities but all other possible benefits and detriments.

Mother proposes that she be made the primary physical custodian of Claire. She suggests that she have physical custody for four weeks in a repeating six-week cycle, that father have custody of Claire for the other two weeks, and that father have reasonable visits with Claire in Pennsylvania when he is able to travel from his home to mother's home.

Father's position is that the parties should equally share physical custody under a schedule whereby there is a repeating ten-week cycle. Under father's proposal, he would have physical custody for five weeks and mother would have physical custody of Claire for the other five weeks of the cycle. Father proposes that the third weekend in each five-week period be for the non-custodial parent to spend time with Claire so that she does not go too long

without seeing both parents.

Father made an understandable decision in accepting the employment in Vermont based upon his yearlong frustrating employment search in a tough job market, the proximity of his family of origin, his comfort in living in Vermont and the benefits of his job.

Since Claire's birth, she has always had nurturing parents. Her every need has been satisfied when the parties both lived in Pennsylvania. Now that one parent lives in Pennsylvania and one parent lives in Vermont, any custody arrangement that is put in place that keeps both parents involved in Claire's life will provide her the same excellent quality of life that she has always experienced. This is due to economic factors and a number of non-economic considerations including the relative responsibility practiced by both parents, the many levels of support given by both families of origin, the periodic cooperation of the parties in tending to the needs of Claire, the parents' realistic plans for career improvement and the steady employment of both parties including the recent increase in income by Father.

There is another non-economic factor which I find to be crucial. Despite his many positive points, father frequently refuses to share information with mother about Claire or, alternatively, he provides only minimal information. If father continues in this practice, which has existed for more than a year since the separation of the parties, mother can count on finding out little about her daughter during any substantial custody time that Claire would spend with father in Vermont. To allow such an arrangement is to create a circumstance for ineffective co-parenting. Mother's communications practice bas been,

commendably, just the opposite of father's practice. She consistently advises father of what is going on in Claire's life. She attempts to get his input on key decisions. He is often not receptive to any of this. There is no evidence that mother is annoying in her attempts to keep father informed.

It has been mother who has taken the lead on a number of important subjects in Claire's life such as deciding when there should be healthcare appointments, making sure they are scheduled, healthcare follow-up, and informing the other parent of all significant healthcare events. Father has assisted, to be sure, but mother has been the coordinator. Mother's family is immediately available to her. Father's family, although a relatively short driving distance away, is available when needed.

Father's shortcoming is the communications problem. Mother has a shortcoming too. She has said inappropriate things about one of father's relatives in the presence of Claire. While there is a question as to whether Claire understood any aspect of that because of her young age, mother must keep comments like those to herself when she is in the presence of the child, particularly if the person about whom mother is speaking is someone dear to Claire. There were allegations of physical acting out. Each party accused the other of being the aggressor. Because of the conflicting perceptions on this, it is difficult to determine who was primarily at fault. I conclude that both parties acted inappropriately at some point during these events.

Although custody details have been made more difficult by father's moving to Vermont, he had no ill motive in making that move. Similarly, mother does not oppose father's shared physical custody proposal to frustrate his

plans. Mother and father, with their respective proposals, believe that they are acting in the best interests of Claire.

As to the final *Gruber* factor, fortunately, father's home in Vermont is not so distant that it precludes either parent from having a meaningful relationship with Claire. After reflection on this factor, I believe I have chosen a custody arrangement which best facilitates the opportunities to foster the child's overall relationship with both parents.

Under all of the circumstances, Claire's best interests require that a shared physical custody arrangement be rejected. Her best interests require that mother be the primary physical custodian. Her best interests also require that the court adopt the rather liberal custody arrangement that she suggests for father.