Morales v. Smith

*David Vaida,* for plaintiff.
*Melissa P. Rudas,* for defendant.

FORD, *J.,* February 8, 2011 — Plaintiff, Nelson Morales (father), and defendant, Sha-Kirra Smith (mother), have a six-year-old daughter, Elyce Morales. After the parties' separation, father filed a complaint for custody on March 11, 2009, because father and mother could not resolve their custody differences. Through mediation, they came to an agreement. That was made an order of court on May 13, 2009.

As the months passed, custody difficulties developed. Mother decided that she wanted to relocate to South Carolina with the child. That caused her to file "notice of intention to relocate" on September 9, 2010. On the same day, she filed a petition for modification asking the court

for permission to relocate to South Carolina.

A conference was held with the custody master. Father made it clear at the conference that he opposes mother's petition for modification, particularly her effort to relocate to South Carolina. A hearing was conducted on the petition for modification on January 18, 2011. After consideration of the testimony presented at the January 18 hearing, the court concludes that it is in the best interests of Elyce to allow mother to relocate with her to South Carolina. In the order that is entered on this petition, father is also granted meaningful custody rights.

## FINDINGS OF FACT

1. The parties' daughter, Elyce Morales, was born on March 27, 2004. She is six years old. She is in the first grade at Ritter Elementary School in Allentown and is doing well in school.

2. Mother and father had a relationship for several years. Although their relationship ended in 2006, father has stayed at mother's residence a few times since then. They were never married to each other.

3. Mother is 31 years old. She presently lives at 1205 East Mark Street in Allentown, Lehigh County. She has lived there for almost four years. She resides there with Elyce, her 10-year-old son, Josh (from another relationship), and her boyfriend, Alonzo Rice.

4. Mother shares equal physical custody with Josh's father.

5. Mother has been employed at Walgreen's

Distribution Center for almost twelve years. She works the 6:00 a.m. to 2 p.m. shift, Monday through Friday. This is a physically demanding job for mother in that it entails constant lifting and bending. Mother has had back problems. She has had surgery on her feet. Also, she has completed the general curriculum courses at a community college which could lead to a nursing degree.

6. Father presently resides at 5061/2 Allen Street, Allentown, Lehigh County. He lives there with Daisy Morales whom he married on August 6, 2010. Ms. Morales's son, daughter, Ruby, and Ruby's child also live in that residence. The residence has five bedrooms. Father also has a 19-year-old son who does not live with him. For a period of time, father was estranged from his son but that relationship was reestablished approximately six years ago.

7. For the past three months, father has worked as a poker dealer at Sands Casino. He works shifts beginning at 7:00 p.m. until the following morning with quitting time between 5:00 a.m. and 11:00 a.m. depending upon business during the shift. He has had previous employment at Americold for almost four years and at Walgreen's for almost seven years but the dates of the employment are not known. He also took some courses at a community college.

8. In 2006, the parties separated after they sold a house in which they lived together. From then until the present, mother has had stable housing. From that separation until October 2009, father did not have stable housing. He primarily lived at the Royal Motel on Airport Road

in Allentown. Other places where he has stayed were his brother's home, an apartment in Allentown and, on a few occasions, at mother's residence.

When Elyce visited him during the period between 2006 and 2009, Elyce often did not have her own bed and slept in the bed with father. Father's residence situation stabilized when he met his present wife and began staying at her home on Allen Street.

9.   For the first two years of Elyce's life, father was an involved and responsible parent in every respect. This was during the period of time that he owned the home with mother. From the selling of that home in 2006 until October 12, 2010, father irregularly visited Elyce. His sporadic contacts with his child averaged approximately two times per month. There was one occasion when father did not see Elyce for about three months.

10.   Even though father was granted custody of Elyce for several days each week in the agreed order of May 13, 2009, he continued to infrequently see her.

11.   Father offered mother unbelievable excuses for not visiting Elyce regularly. His usual excuses were that he had to work or that he had to be in New Jersey or New York. There were occasions when father promised that he would visit Elyce at specific times. Mother prepared Elyce for the visits, including packing a bag for her to go. Father disappointed Elyce, who waited with backpack on, by not appearing for the visits as he promised.

12.  Father did not exercise custody with Elyce on Christmas day 2010, or New Year's day 2011, despite

a court order granting him custody on those days. The excuses he gave in court for missing those days were unconvincing. He missed his daughter's Christmas show this year.

13. Except for Christmas and New Year's, father has exercised the custody granted to him by court order since October 12, 2010, to the date of hearing.

14. Father does not have a driver's license. Before October of 2010, mother provided most of the transportation for father's visits with Elyce. When father began to regularly exercise custody in October of 2010, he had a number of other people dropping off and picking up Elyce because he did not have a driver's license. Father did not accompany these people in transporting Elyce. Mother did not know these people. Since October, father's wife has often driven Elyce to and from her school.

15. Father has not attended parent-teacher conferences, open houses or, with the exception of an event involving Elyce at Dieruff High School, any other school events. He has not taken Elyce to doctor or dentist appointments or been involved in her healthcare in any way. Mother has done all of these. Even though the May 13, 2009 order made him a joint legal custodian, he blames his non-involvement on mother's not telling him about appointments and events.

16. Father's mother resides in Puerto Rico. His father is deceased. Father has two brothers who reside in Pennsylvania.

17. Mother's father, mother, a brother, a sister, and two nieces reside together in a residence in Columbia, South

Carolina. Mother has aunts, uncles, and cousins who reside in the Pocono Mountains area of Pennsylvania. While mother has a good relationship with these relatives in Pennsylvania, they are not residential resources for her.

18. Mother's plan is to immediately relocate to South Carolina with Elyce, her son, and her boyfriend, and to reside in her parents' home. She wants to enroll in a nursing school in South Carolina and secure her degree. She has investigated nursing schools in South Carolina. Her curriculum would involve full-time nursing studies so mother would be unable to simultaneously work a full-time job. Nevertheless, she would be able to spend more time with her children. She would not attend school in the summers. Her parents have agreed to assist her with baby sitting and payment of her bills. Mother would not be charged rent to reside with her parents. Mother's boyfriend, Mr. Rice, agrees with mother's plan. He intends to move to South Carolina with mother, leave his present employment, and secure employment in South Carolina. (Mr. Rice did not testify at the hearing but was present in the courtroom when Mother testified.)

19. In South Carolina, mother would no longer have to perform physical labor to the extent that she presently performs it at Walgreen's which is taking its toll on her body, particularly her back.

20. Mother has investigated the school district for Columbia, South Carolina.

21. Josh's father agrees with mother's relocation to South Carolina. He and mother have reached an

agreement that Josh would finish the present school year in Pennsylvania, then stay with his father over the summer of 2011, live with mother for subsequent school years in South Carolina and then live with his father each summer.

22. The parties have an inability to communicate effectively. They only communicate by text.

23. Mother proposes that father have custodial time with Elyce summers, Christmas breaks, and any other school breaks. Mother is also agreeable to father's visiting Elyce on any visits father can make to South Carolina.

24. Father opposes mother's planned relocation to South Carolina because he would like to be meaningfully involved in his child's upbringing. He has the fear that the inability to have regular contact with Elyce because of the distance in miles between his and mother's homes would relegate him to the role of part-time father.

## DISCUSSION AND CONCLUSIONS OF LAW

The "ultimate guidepost" in a child custody case, including a relocation dispute, is the child's best interests. *Meyer-Liedtke v. Liedtke*, 762 A.2d 1111, 1115 (Pa. Super. 2000); *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992). The focus must be on what is in the best interests of the minor child, Elyce, and not what is best for the parents. *English v. English*, 469 A.2d 270, 273 (Pa. Super. 1983). In my attempt to determine the best interests of Elyce, I considered "all factors which legitimately impact upon the child's physical, intellectual, moral and spiritual well-being...." *Zummo v. Zummo*, 574 A.2d 1130, 1137

(Pa. Super. 1990).

Although the child's best interests remain the ultimate guidepost, the Superior Court has adopted a three-pronged test to assist in resolving custody relocation disputes. In *Gruber v. Gruber*, 583 A.2d 434 (Pa. Super. 1990), the Superior Court held that the following three factors should be given special consideration in a relocation dispute:

(1) the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent;

(2) the integrity of the motives of both the custodial and the non-custodial parent in either seeking the move or seeking to prevent it; and

(3) the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent. *Id.* at 184-85, 583 A.2d at 439.

In applying the *Gruber* test, a court must seek to accommodate the following interests as nearly as possible:

[T]he custodial parent's desire to exercise autonomy over basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of

his or her children; and, finally the state's interest in protecting the best interests of the children. *Id.* at 184, 583 A.2d at 438-39.

Mother argued at the hearing that she has satisfied each *Gruber* factor and that it is in Elyce's best interests to relocate with her to South Carolina. I agree.

Many circumstances make mother's situation in Pennsylvania difficult for her and, consequently, difficult for Elyce. Mother has responsibly maintained employment at Walgreen's for years but this has taken a toll on her body in terms of foot and back problems. She testified that it is extremely difficult for her to continue this work. She has completed a good portion of her studies to establishing a new career in nursing which she believes will be personally fulfilling, less demanding physically, and more financially beneficial. Father does not contest mother's sincerity about becoming a nurse.

It is true that the Lehigh Valley has several fine institutions to train individuals to become nurses. With mother's financial needs and her childcare obligations, she cannot presently maintain full-time employment, engage in full-time nursing education, and be the primary custodian for Elyce. She needs a support system.

Father argued at the hearing that, with his assistance, mother can achieve her goals. History proves otherwise. Except for the first two years of Elyce's life, and the last three or four months, father has been only an occasional presence in Elyce's life. Even as to the months since October of 2010, father failed to see his child on Christmas, New Year's, and failed to attend her Christmas show. Mother

describes father's involvement with Elyce as "unreliable." This is accurate. Over a course of years, he has seen the child only a few times per month and actually "stood up" the child when he promised that he would be coming for visitation. For a period of three months, he had no contact with her at all. Tellingly, he blames the three month absence on mother's refusal to respond to him. While mother may have been unresponsive to father at times, mother would have welcomed his contact with Elyce more than two times per month and certainly at many points over his three month absence from Elyce's life. Father was unbelievable as to all of the excuses he offered for the failure to be in contact with Elyce. In reality, the failure was based upon lack of interest, unstable housing, and improper priorities.

There are significant advantages to mother's move to South Carolina. She has demonstrated that the move will substantially improve the quality of life for her and Elyce. Her expenses will be immediately reduced in that she will be permitted to live rent-free in her parents' home. Her parents will assist with all bills. Childcare is fully available for mother from her parents and her adult siblings. Because her parents will provide a home for her, mother will be able to pursue her nursing studies full-time, something that she cannot do in Pennsylvania. She and Elyce will be relieved of father's lack of dependability. (Father made a general allegation that mother was irresponsible because she often went to clubs. No detail was provided so the court cannot make a determination whether this is true.)

The move to South Carolina is not the result of a momentary whim by mother. Circumstances have been

deteriorating in terms of sharing parental duties and the need to make a significant change has culminated in this plan by mother. From everything presented, Elyce will benefit from the move because stability in terms of care for her will be ensured, the economic necessities will be provided and a positive emotional environment will exist.

As to the second *Gruber* prong, mother has established the integrity of her motives in seeking the move to South Carolina. She wants to eliminate the instability in her life created by father's lack of attention to what he should do as a father. She wants to continue on a course, already begun, toward a nursing degree for employment that she thinks will be physically less demanding and financially beneficial to her and her child. Mother has convinced the court that she wants father involved in Elyce's life and, for the most part, has promoted the father-daughter relationship. Because father has not consistently assisted in her efforts to do that, she properly sees the move to South Carolina as the only workable alternative. Thus, mother . has established proper motives in asking for relocation.

In addressing this second prong, it provides the court the opportunity to note that there is no doubt that father loves Elyce. In fact, his reason for resisting the move is that he is concerned he will be relegated to the position of a part-time father and will miss important milestones in Elyce's life as she moves through childhood. He is not resisting the move to simply frustrate mother. He genuinely wants to have a close relationship with his child. Although father has probably always wanted these things, his actions have not meshed with his intentions. So, while his motives are

proper, he has not measured up to what a father should do in the raising of his child. Incidentally, the provision of separate custody time for father in Pennsylvania while mother resides in South Carolina will serve to enhance father's dependability with Elyce. He will not be able to take mother for granted. He will have to be present for Elyce to provide all aspects of care for her.

As to the third prong, the court has fashioned a schedule for father that is a realistic visitation arrangement. If father exercises all of the custody time given to him under today's order, he will be spending more time with Elyce each year than he did for the period of the parties' separation from 2006 until October of 2010. Partial custody has been set up for father in such a way that he sees Elyce throughout the year, namely, the entire the summer, most of the Christmas vacation, and then one week of custody in the fall and one week of custody in the spring. In addition to that, father is at liberty to travel to South Carolina any time to spend time with Elyce. The order creates a situation whereby the father-daughter relationship can proceed evenly and become strong.

For all of these reasons, it is in Elyce's best interests that mother be permitted to relocate with her to Columbia, South Carolina and that father be granted the partial custody detailed in today's order.