**Roberts v. Nafus**

---

336

*James A. Butz*, for plaintiff
*John L. Dewitsky, Jr.*, for defendant

HIGGINS, *J.*, June 6, 2013—This matter comes before the court on plaintiff Daniel Roberts' (hereinafter referred to as "father") complaint for custody. On August 14, 2012, father filed a complaint for custody concerning Novaleigh Roberts (hereinafter referred to as "Novaleigh"), age 5, date of birth 6/6/2007. Novaleigh's mother is defendant Teresa M. Nafus (hereinafter referred at as "mother"). Mother seeks take Novaleigh with her to Michigan where she relocated in October 2011. Mother and father were never married and although father is listed as "father" on Novaleigh's birth certificate, he is not the biological father of Novaleigh.

Our first inquiry, therefore, is whether father has standing to pursue custody of Novaleigh. 23 Pa. C.S.A. §5324, states in pertinent part:

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

(1) A parent of the child.

(2) A person who stands in loco parentis to the child.

23 Pa. C.S.A. §5324(1),(2).

Mother testified at our initial hearing on January 11,

2013 (hereinafter referred to as "N.T. 1/11/13) that she became pregnant while she was living in North Carolina. [N.T., 1/11/13] Mother was dating Jason Matthews, Novaleigh's biological father and during her pregnancy she considered giving Novaleigh up for adoption. [N.T., 1/11/13] During cross examination, mother stated that Mr. Matthews asked mother to abort the pregnancy as he was unable to raise a child. [N.T., 1/11/13] Mother also stated that Mr. Matthews has never met Novaleigh. [N.T., 1/11/13]

Father testified at our subsequent hearing on February 20, 2013 (hereinafter referred to as "N.T. 2/20/13) that he had known mother since high school. [N.T.2/20/13] Father reconnected with mother in March 2007 through the website Myspace.com. [N.T. 2/20/13] Mother was experiencing depression so father traveled to North Carolina to help mother move back to this area. [N.T.2/20/13] Mother and father began dating and living together. [N.T.2/20/13] Father told mother that he would "step in" as dad and he is listed as father on Novaleigh's birth certificate. [N.T.2/20/13] Father and mother signed an acknowledgement that father was Novaleigh's father. [N.T. 2/20/13] Novaleigh has father's last name as her surname. [N.T.2/20/13]

In September 2007, mother and Novaleigh started living with father. [N.T., 1/11/13] Novaleigh was 3 months old when she began living with father. [N.T., 1/11/13] Father has been the only "father" in Novaleigh's life. [N.T. 2/20/13] Since Novaleigh was born she has had no contact with the biological father and no other person has asserted paternity. [N.T., 2/20/13] Mother refers to

father as a loving man, however, in September 2011, mother and father ended their relationship. [N.T. 1/11/13] Nevertheless, Novaleigh has continued to live with father. [N.T., 1/11/13] In October 2011, mother permitted Novaleigh to remain with father[1] when she moved to Kalamazoo Michigan. [N.T., 1/11/13]

Standing to pursue any form of physical custody is granted to any person who is a parent of the child. Under the facts set forth above, we have no doubt that father is Novaleigh's parent. Father is listed as father on Novaleigh's birth certificate and he has been her father since her birth. Father provided support, cares for and loves Novaleigh. Father testified that he has changed Novaleigh's diapers, fed, clothed, played and generally taken care of all her needs. Novaleigh calls father "daddy." Furthermore, our Superior Court has stated that [s]tanding will be found where the child has established a strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent." *S.A. v. C.G.R.*, 856 A.2d 1248 (Pa. Super. 2004) (citation omitted). Therefore, we believe that even if mother could successfully challenge father's status as Novaleigh's father, father has standing to pursue custody pursuant to 23 Pa. C.S.A.§5324(2). We will now address the merits of father's request for custody.

---

1. Mother had a document drawn up stating that father would keep Novaleigh until December 26, 2011 unless mother requested father to keep her longer. Mother was unable to have Novaleigh come to Michigan until March 2012, when Novaleigh lived with mother for three weeks. In April 2012, mother returned Novaleigh to father due to housing constraints. Novaleigh has lived with father in Monroe County since that time.

In a child custody case, our ultimate purpose is to determine what is in the best interest of the child. *Clapper v. Harvey*, 716 A.2d 1271, 1273 (Pa. Super 1998) (citation omitted). In determining the best interest of the child, we must proceed on a case-by-case basis and we must consider all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being. *Fuehrer v Fuehrer*, 906 A.2d 1198, 1200 (Pa. Super. 2006) (citations omitted).

Pennsylvania state legislature has defined elements, which are to be considered in custody cases. The statute, in relevant part, is as follows:

(a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's

education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. §5328(a).

As the Pennsylvania courts have interpreted, the statute requires that in any custody case, our paramount concern must be for the best interest of the child after considering all factors set forth above. *S.M. v. J.M*, 811 A.2d 621, 623 (Pa. Super. 2002)(citations omitted). As the best interest of the child is a nebulous concept, we will consider all relevant factors affecting the child's well-being. *Landis v. Landis*, 869 A.2d at 1003 (Pa.Super. 2005). There are no presumptions in favor of either parent. *Sawko v. Sawko*, 625 A.2d 692 (Pa. Super. 1993). Accordingly, we will make its determination based solely on the particular facts and circumstances of each case. *Id.*

Instantly, we find that Novaleigh is a healthy 5 year old child. It is apparent from the testimony that Novaleigh is deeply loved by both of her parents and family. Both parents seem to want what is best for Novaleigh. However, our concern must be for the best interest of Novaleigh and not that of mother or father.

In considering the above factors, we find that numbers 2, 8, 15 and 16 have no application to this case. In regard to numbers 3, 9 and 10, we find that these factors weigh equally in regard to both parents. Factor 1 favors father slightly. Father has maintained contact with mother concerning Novaleigh's progress and care. [N.T., 2/20/13] Since October 2011, father has made sure that Novaleigh

was accessible by telephone for mother to communicate with her. [N.T., 2/20/13] There is no evidence that father has hindered mother's access to Novaleigh either by telephone, computer or otherwise. Although no evidence was introduced to suggest that mother would not permit frequent and continued contact with father should Novaleigh be permitted to relocate to Michigan, we find that the evidence presented at hearing demonstrates that father would encourage and permit frequent contact between Novaleigh and mother, therefore, factor 1 favors father slightly.

In regard to factors 4 and 5, we believe that these weigh in favor of father. Father has provided stability and continuity in Novaleigh's life. Father attends to all of Novaleigh's needs including assisting her with school work, playtime and socialization. Father takes Novaleigh to see extended family members, including mother's family. He takes Novaleigh to see her friends outside of the school and daycare settings and father takes Novaleigh fishing as well. Mother, however, has relocated several times and is currently living in an area where Novaleigh does not have any family, with the exception of her half-brother Austin who is 15 years old. Mother testified about the "Kalamazoo promise" which is a program for children in Kalamazoo Michigan to obtain a free or reduced college education. While this sounds an excellent program, we cannot base our decision to permit Navaleigh to relocate based solely on the basis of this program. We also note that mother has not filed a petition to relocate which was noted in the custody conciliator's recommendations which were made an interim order of court. Additionally, we also

consider that need for stability in Novaleigh's life and the availability of extended family. Given the evidence we heard at hearing and considering all the facts in this case, we find that factors 4 and 5 weigh in favor of father.

Factor 6 weighs in favor of mother. Mother and Austin live together in Michigan and we believe that continuing relationship between Novaleigh and Austin is important. However, the unavailability of extended family members must also be considered. Nevertheless, factor 6 favors mother.

The proximity of distance between the parties' households is a difficult consideration in this case. There is approximately 600 miles between the households. Clearly this favors father who has remained in the home which Novaleigh knows as "home." Mother has chosen to relocate to Michigan which removes Novaleigh from her familiar environment.

Factor 12 favors father. While mother testified that she has made child care plans, we believe that the proximity of both mother's and father's extended family to father's home weighs in favor of father's ability to care for Novaleigh. Father stated that he continues to take Novaleigh to daycare to keep continuity in her life. He also testified to other family members who help care for Novaleigh, including Aunt Linda and mother's mother, Bev. Accordingly, we find that factor 12 favors father.

Finally, we find that factor 14 weighs against mother. Mother testified at hearing that she smoked marijuana, however, she quit in September 2011 when she moved to Michigan. During his testimony, father stated that Mother

smoked marijuana every day. [N.T., 2/20/13] Although mother denies ingesting any marijuana in Michigan, we must consider this factor as a history of drug use which weighs against mother. In addition, mother desires to relocate Novaleigh to Michigan, therefore, we must engage in a discussion pursuant in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434 (1990).

When there is a request by one of the parents to relocate with the child, then the best interest analysis must incorporate the three factors originally outlined in *Gruber*. *See Landis*, 869 A.2d at 1011 (in a relocation case, the *Gruber* factors must be considered and applied "under the umbrella of the ultimate objective of determining the best interests of the child") (citation omitted). Specifically, under *Gruber*, the court must consider the following:

> the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent; **** the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; [and] the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent. *Landis*, 869 A.2d at 1011-12 (citations omitted). *Collins v. Collins*, 897 A.2d at 471-472.

In *Klos v. Klos*, 934 A.2d 724 (Pa. Super. 2007), our Superior Court stated:

Where a custody order exists prior to the petition to relocate, the parent who desires to relocate bears the burden of proving the aforementioned elements. *Id.*, 897 A.2d at 472 n.6. On the other hand, where the trial court is to formulate a primary physical custody order as well as to decide a petition for relocation, both parents stand on equal footing, sharing the burden of production and persuasion to demonstrate that the living situation that they will provide to the children serves the children's best interests. *Id.*, 897 A.2d at 472. Consequently, while important, the *Gruber* factors are but one aspect of the overall best interest analysis that is required when the trial court is formulating a primary physical custody order as well as deciding a petition for relocation. *Collins*, 897 A.2d at 472. *Klos*, 934 A.2d at 728-729 (footnote omitted).

No final custody order has been entered in this case. A custody conciliation conference was held on September 5, 2012, which led to an interim order dated September 11, 2012 awarding father primary physical custody under and subject to partial physical custody of mother. Therefore, this is not purely a relocation case; the standard described by the *Klos* court is the one that is applicable. The *Gruber* factors must be considered, but in the context of the overall best interests of Novaleigh.

Both parents impressed the court with their sincere interest in their child's welfare. We believe that father is sincere when he testified that Novaleigh is the "greatest thing that ever happened to me." [N.T., 2/20/13] Father was present at Novaleigh's birth. [N.T., 2/20/13] Father has provided Novaleigh with a stable environment and has

taken care of her since her birth. [N.T., 2/20/13] Father testified credibly that he changed her diapers, bathed, clothed, fed, played and generally attended all of the needs. [N.T., 2/20/13] Father has provided all care for Novaleigh since mother relocated to Michigan in October 2011, except for a three week period when Novaleigh resided with mother in Michigan. [N.T., 2/20/13] Father stated that he is unemployed presently but has been discussing a new position at a car care center scheduled to open soon. [N.T., 2/20/13] Even through father is not currently employed, he takes Novaleigh to daycare where the bus picks her up for school and later drops her off after school. [N.T., 2/20/13] Father would like Novaleigh's schedule to be consistent, especially when he returns to full time employment. [N.T., 2/20/13]

In addition, father has extended family in the area to assist him with Novaleigh's care. [N.T., 2/20/13] Father takes Novaleigh to see "Grammy" father's mother) weekly and has maintained contract with mother's mother, who also lives close to father. [N.T., 2/20/13] Although father initially made an agreement with mother to allow Novaleigh to relocate to Michigan, father is concerned that mother's apartment is not big enough for Austin, Novaleigh and mother. [N.T., 2/20/13] Father also expressed concerns that Novaleigh would be taken from her family, friends and school by moving to Michigan. [N.T., 2/20/13]

On the other hand, since March 2012, Mother has obtained a larger apartment in Kalamazoo Michigan. [N.T., 2/20/13] We believe that Novaleigh would benefit from having her brother at home with her in Michigan.

However, mother indicated in our 2/20/13 hearing that she has had to take a second job (with the same company) to be able to afford to drive back to Pennsylvania. [N.T., 2/20/13] Mother also testified that it is difficult for her to call Novaleigh because of work schedule conflicts. [N.T., 2/20/13] Nevertheless, mother indicates that she will only work during the days when Novaleigh comes to live with her. Mother has presented a day care plan at a facility a couple of blocks from her apartment where Novaleigh would be cared for between 1 and 1 1/2 hours each day. Mother also testified that things would be different from Novaleigh's first stay with her in Michigan. [N.T., 2/20/13] Mother believes that Novaleigh had no adjustment period in March 2012 and she now has a larger apartment. [N.T., 2/20/13]

Addressing the *Gruber* factors, we find that while the move to Kalamazoo Michigan is of benefit to mother because of her job situation, it is not in the best interests of Novaleigh. The move would require Novaleigh to leave her familiar surroundings, friends and school. Novaleigh has a great support system here which includes mother's family. While we find no improper motive in mother's decision to relocate, we do not find that the move would substantially improve the quality of Novaleigh's life. We believe that there would be a period of adjustment and a considerable loss of deeply-rooted ongoing relationships with father, his family and the loss of support from mother's family. Nevertheless, we also find no improper motives in father's decision to oppose the move, because he believes that keeping Novaleigh in her current home and familiar settings is preferable to completely changing

schools to live 600 miles from the majority of her family. Our decision began by placing the parents on equal footing and thereafter applying the circumstances discussed above. After careful reflection, we are convinced that Novaleigh's best interests are served by maintaining the status quo and allowing father to continue with primary physical custody. Partial custody arrangements will be made for mother during school holidays with extended visits during summer vacation.

For the foregoing reasons, we believe that the current custody arrangement is in Novaleigh's best interest. Accordingly, we enter the following order:

## ORDER

And now, this 6th day of June 2013, following a custody hearing before the court during which Teresa M. Nafus (mother) was represented by John L. Dewitsky, Jr., Esquire, and Daniel Roberts (father) was represented by James A. Butz, Esquire, all prior custody orders with respect to the minor child, Novaleigh Roberts, born June 6, 2007, are rescinded and the following order is entered:

## 1. SHARED LEGAL CUSTODY

Mother and father shall share legal custody of the minor child. For purposes of this recommendation, "shared legal custody" shall mean:

(a) All decisions affecting the child's growth and development, including but not limited to education, choice of school, medical and dental treatment, religious training, athletic pursuits and extracurricular activities shall be considered major decisions, and shall be made by

the parties jointly after discussion and consultation with each other with a view toward obtaining and following a harmonious policy in the child's best interest;

(b) Each party agrees to keep the other informed of the progress of the child's education and social adjustment. Each party agrees not to impair the other party's right to shared legal or physical custody of the child. Each party agrees to give support to the other in the role as parent and take into account the consensus of the other for the physical and emotional well-being of the child with the recognition that their life styles may be different;

(c) While in the presence of the child, neither party shall make or permit any other person to make any remarks or do anything which would in any way be construed as derogatory or uncomplimentary to the other parent. It shall be the express duty of each parent to uphold the other parent as one whom the child should love and respect;

(d) It shall be the obligation of each parent to make the child available to the other in accordance with the following schedule and to encourage them to participate in the plan hereby set forth;

(e) Each parent shall have the duty to notify the other of any event or activity that could reasonably be expected to be of significant concern to the other parent or to the child;

(f) The parents shall communicate with one another concerning any parenting issues requiring consultation and agreement regarding a proposed modification of the custody schedule which may, from time to time, become necessary, and shall specifically not use the child as a

messenger at any time. Neither party shall discuss with the child any proposed changes to this schedule or any other issue requiring consultation and agreement prior to discussing the matter and agreement with the other parent;

(g) With regard to any emergency decisions which must be made, the parent with whom the child is physically residing at the time shall be permitted to make a decision necessitated by the emergency without consulting the other parent in advance; however, that parent shall inform the other of the emergency and consult with him or her as soon as possible. Day to day decisions of a routine nature will be the responsibility of the parent having physical custody at that time;

(h) Mother and father agree to share complete and full information from any doctor, dentist, teacher or other authority, and each parent may have copies of any reports given to them as a parent. Each parent shall also request any authority to forward copies to both parents at their respective addresses. Such documents include, but are not limited to, medical reports, athletic and school reports, birth certificates, etc. Both parents may and are encouraged to attend conferences and activities with the child. Both parents shall be listed with any school or day care center as parents to be contacted in the event of an emergency and to be notified regarding school events. Mother and father agree to share copies of any school notices in a timely fashion;

(i) Both parents shall attempt to avoid scheduling any activities or appointments for the child which would require his/her attendance or participation during the time

when he/she is scheduled to be in the physical custody of the other parent without the parent's prior approval; however, both parents agree to cooperate and be flexible in accommodating the child's scheduled activities.

## 2. SHARED PHYSICAL CUSTODY

The parities shall share physical custody of the minor children with father exercising primary physical custody of the child, under and subject to the mother's partial physical custody rights as follows:

(a) During the school year, at any time there is at least a seven day school holiday, mother shall have custody of the child for the entire school vacation;

(b) During the summer school vacation, from the third day after school ends to the Saturday at 12:00 p.m. (noon) one week before school begins;

(c) Anytime while in Pennsylvania upon reasonable notice to Father to be exercised in 48 hour increments; and

(d) Additionally, the parties shall share custody of the children according to such terms to which they may agree.

## 3. HOLIDAYS

The parties shall alternate the major holidays as the parties may agree. If unable to agree, the alternating holiday schedule shall include the holidays of Thanksgiving, Christmas and Easter. The period of holiday custody shall include the entire school vacation. These periods of

holiday custody shall begin with mother on Thanksgiving 2013. Mother shall have partial custody on Mother's Day and father shall have partial custody on Father's Day.

## 4. TRANSPORTATION

In order to facilitate the exchange of partial custody of the minor child, it shall be the responsibility of the parties to meet at a place 2/3 the distance from the father's residence and 1/3 the distance from mother's residence. Appropriate passenger restraint devices shall be utilized by the child while being transported.

## 5. TELEPHONE ACCESS

Each parent shall allow the other parent to have private, liberal and reasonable telephone access with the minor child during that parent's period of partial custody. This shall include the child initiating such contact. Reasonable telephone access shall be construed to be during the child's normal waking hours, emergencies excepted. If the calling parent leaves a message at the residence of the custodial parent, custodial parent shall require the child to return the telephone.

## 6. NOTICE: CHANGE OF RESIDENCE OR RELOCATION

Before a party may relocate the children OR change the residence of the children in a manner which significantly impairs the ability of the other individuals with custody rights to the children to exercise those rights, the party must comply with the requirements and obligations of Pennsylvania's Custody Law set forth in 23 Pa. C.S.A.§5337.